533 F.Supp. 567 (1980)
In re SWINE FLU IMMUNIZATION PRODUCTS LIABILITY LITIGATION.
Ellen BEAN, Plaintiff,
v.
UNITED STATES of America, Defendant.
Civ. A. No. 79-F-571.
United States District Court, D. Colorado.
August 19, 1980.
*568 *569 Jack Kintzele, Kintzele & Collins, and L. Thomas Woodford, Myers, Woodford & Hoppin, P. C., Denver, Colo., for plaintiff.
Joseph F. Dolan, U. S. Atty., William C. Danks, and Kathryn Richman, Asst. U. S. Attys., Denver, Colo., Jeffrey Axelrad, Director, Torts Branch, Civil Division, U. S. Dept. of Justice, and W. Russell Welsh, Trial Atty., Torts Branch, Civil Division, U. S. Dept. of Justice, Washington, D. C., for defendant.

MEMORANDUM OPINION AND ORDER
SHERMAN G. FINESILVER, District Judge:

BACKGROUND AND OVERVIEW OF THE CASE
On November 16, 1976, plaintiff Ellen Bean, age sixty-two and a resident of Jefferson *570 County, Colorado, received a swine flu vaccination administered pursuant to the National Swine Flu Immunization Program of 1976. The program was designed to inoculate the country's adult population against the threat of a swine flu epidemic. Shortly after her vaccination, in December, 1976, plaintiff developed an illness known as drop foot. At the time of trial, plaintiff still suffered from this condition which requires her to wear a brace on her left foot in order to walk properly.
In this suit, brought under the Federal Tort Claims Act[1], 28 U.S.C. §§ 1346(b), 2671 et seq., it is claimed that the defendant, United States, is liable to Mrs. Bean for her illness. Plaintiff seeks recovery based on theories of negligence, strict liability, breach of warranty, and failure to adequately warn her of possible adverse reactions to the vaccine. The government contends that there is no causal connection between the vaccination and her condition, and that even if a causal relation is proven, that plaintiff cannot establish any theory of recovery which would render defendant liable.
The questions presented are whether plaintiff's drop foot was caused by the vaccination, and if so, is defendant liable; also present is the issue of the adequacy of the warning given to plaintiff. On these pivotal issues, we find in favor of defendant, United States of America.

I.

PRETRIAL MATTERS

THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION
The action was filed on May 14, 1979. On June 20, 1979, it was transferred by the Judicial Panel on Multidistrict Litigation to the United States District Court for the District of Columbia for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407.
A substantial portion of plaintiff's brief is addressed to the issue of whether in the Fall of 1976 the possibility of a swine flu epidemic posed a threat to the general population of the United States. The justification for the program, however, is not in issue. During consolidated pretrial proceedings, the transferee court, in ruling on a motion for summary judgment filed by the United States, held that:
[T]he following decisions and actions are covered by the exemption to the Federal Tort Claims Act set forth at 28 U.S.C. § 2680(a)[2] and may not be a predicate for liability in these cases:
a. The decision to establish a National Swine Flu Immunization Program.
b. The decision to suspend the program on December 16, 1976, and the timing thereof.
c. The decision to resume the program on a limited basis in February 1977.
See, Stipulation and Final Pretrial Order, In Re Swine Flu Immunization Products Liability Litigation, MDL No. 330, Misc. No. 78-0040, p. 2, 89 F.R.D. 695 (D.D.C. Nov. 15, 1979).
The Order also limits the litigants to local discovery only as distinguished from national discovery. Over seventy depositions were taken during the course of national discovery. Several of those were introduced in evidence in this case.
The case was remanded to this Court on December 21, 1979; a supplemental pretrial conference was held on May 1, 1980. Issues of liability and damages were bifurcated. A non-jury trial[3] on the issue of liability *571 followed. This Opinion and Order resolves the liability issue.
The following are the facts established at trial and our conclusions of law. We highlight conflicts in the testimony.

II.

THE NATIONAL SWINE FLU IMMUNIZATION PROGRAM
The Swine Flu Act of 1976 was an attempt by the Federal Government to inoculate the entire adult population of the United States against the threat of a swine flu epidemic. It was the largest immunization program in this country's history and over forty-five million Americans  or one-third of the adult population  were vaccinated. The initial vaccination was on October 1, 1976; and the program was suspended on December 16, 1976.[4] The program, for which $135 million was initially appropriated by Congress, called for using both private and public health care systems to achieve its goal of inoculating the entire adult population by the end of November, 1976. The November deadline was critical since the season of intense flu transmission in the United States is generally considered to be September through March. See, The Swine Flu Program: An Unprecedented Venture In Preventive Medicine, Report to Congress by the Comptroller General of The United States, June 27, 1977.
The Swine Flu Act became law on August 12, 1976 and was applicable to all swine flu inoculations administered after September 30, 1976. Important provisions of the Act include the following:
1. The Act creates a cause of action against the United States for any personal injury or wrongful death sustained as a result of the swine flu inoculation resulting from the act or omission of a program participant[5] upon any theory of liability that would govern in an action against such program participant including negligence, strict liability in tort, and breach of warranty; 42 U.S.C. § 247b(k)(2)(A);
2. It makes that cause of action the exclusive remedy (42 U.S.C. § 247b(k)(3)) and abolishes the cause of action against the vaccine manufacturer; and
3. It makes the procedures of the Federal Tort Claims Act applicable to suits brought pursuant to the Swine Flu Act (42 U.S.C. § 247b(k)).
The program was prompted in part by the medical discovery in early February, 1976 at Fort Dix, New Jersey, of military servicemen having a new strain of influenza virus antigenically[6] related to the virus prevalent *572 during the 1918-19 swine flu pandemic. That pandemic was responsible for 20 million deaths worldwide, including 500,000 in the United States alone. Prior to 1930, this strain was the predominant cause of influenza in the United States. Since 1930, the virus had been limited to transmission among swine only with occasional transmission from swine to human, with no secondary person-to-person transmission.[7]
In addition, the Swine Flu Act was prompted by the collapse of the commercial liability insurance market, both for vaccine manufacturers and other program participants. The cases of Davis v. Wyeth Laboratories, Inc., 399 F.2d 121 (9th Cir. 1968), and Reyes v. Wyeth Laboratories, 498 F.2d 1264 (5th Cir. 1974), which held a manufacturer of polio vaccine strictly liable in tort, greatly contributed to the insurance problem. For this reason, the Swine Flu Act provided that the exclusive remedy for injury caused by the vaccine would be against the United States.[8] However, since the manufacturers could still insure themselves against negligence liability, they may be liable in a suit by the United States (42 U.S.C. § 247b(k)(7)) if the United States is found to be liable on a negligence theory.
History has demonstrated that no swine flu epidemic occurred during the winter of 1976-77. As can be expected, however, many people who were inoculated also incurred some type of illness, injury or adverse medical condition in a period relative to the vaccination. Lawsuits,[9] such as the instant one, were filed throughout the country for illnesses allegedly resulting from the immunization. In addition, numerous administrative claims have been filed.[10]
The critical question presented in these cases is the causal relationship between the immunization and claimed illness. However, mere temporal relation between the onset of a disease and the vaccination is insufficient to establish legal causation. Each plaintiff has the burden of proving that the swine flu inoculation was the proximate cause of a claimed injury or medical condition.[11]

III.

ADEQUACY OF THE WARNING: INFORMED CONSENT

A.
On November 16, 1976, Mrs. Bean received a swine flu vaccination at a public health clinic in Jefferson County, Colorado. The testimony is in conflict as to whether she received adequate warning of the possible adverse effects of the vaccine prior to inoculation. Plaintiff testified that the only material distributed by the Jefferson County Health Department was a blue card (Plaintiff's Exhibit 3A) which advised her that she might suffer some minor discomfort such as redness and tenderness at the *573 injection site, fever, chills, nausea, aches and other symptoms lasting less than 48 hours.
Testimony indicated that the Jefferson County Health Department has been unable to locate any executed consent forms for November 16. Ms. Virginia Wolf, Assistant Director of Nursing for the County Health Department, testified that she was a coordinator for the vaccination program in Jefferson County; that it was the routine practice at the health center to give each person a registration (consent) form and a national fact sheet containing information about swine flu and the immunization program; and that the signed consent form was exchanged for a blue card which informed the person administering the vaccine whether the vaccinee was to receive a bivalent or monovalent vaccination.[12] The foregoing was prescribed as standard procedure by the State Health Department.
Ms. Barbara Mertens, a communicable disease nurse worked at several of the Jefferson County Health Centers during the immunization program. She testified that a person could not be inoculated without first presenting the blue card and, that such a card was obtained only by exchanging an executed consent form. Both Mss. Wolf and Mertens testified that personnel were available to answer any questions a vaccinee might have, and that such questions were encouraged.
The question of whether evidence is admissible in a proceeding in federal courts is determined by reference to the Federal Rules of Evidence. Envirex, Inc. v. Ecological Recovery Associates, 454 F.Supp. 1329 (M.D.Pa.1978). With respect to evidence of habit and routine practice, Rule 406 of the Federal Rules of Evidence, is instructive:
Evidence of the habit of a person or of the routine of an organization, whether corroborated or not and regardless of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice.
Several cases are informative on the effect of evidence of habit or routine practice.
In Meyer v. United States, 464 F.Supp. 317, (D.Colo.1979) aff'd 638 F.2d 155 (10th Cir. 1980) the trial court stated:
In the context of Rule 406, habit is a person's or organization's practice of handling a particular kind of situation with a specific type of conduct. Habit is one's regular response to a repeated specific situation. McCormick on Evidence § 195 (2d Ed. 1972). In similar fashion, an organization's regularity of action is within the purview of Rule 406.
464 F.Supp. at 321.
In Meyer, the trial court considered evidence of a dentist's regular and routine practice of warning patients of the risks involved in oral surgery as persuasive on the issue of whether he provided such warning to the plaintiff. At trial, plaintiff had unequivocally testified that she received no advice or warning concerning the dangers attending oral surgery. In affirming the district court, the Tenth Circuit held that evidence of habit "does not stand in a special light nor is it to be referred to a second-class category which automatically carries little weight.... [T]he weight to be given to it is dependent on the particular circumstances." 638 F.2d at 158.
The Tenth Circuit has also held that the trial court had properly admitted evidence as to the defendant's customs and habits in operating a ski chairlift in a personal injury action. Ryan v. Aspen Highlands Skiing Corporation, No. 75-1533 (10th Cir. Aug. 17, 1976) (unpublished opinion). In Frase v. Henry, 444 F.2d 1228, 1232 (10th Cir. 1972), the court stated that "[e]vidence of habit or custom is relevant to an issue of behavior on a specific occasion because it tends to prove that the behavior on such occasion conformed to the habit or custom."
*574 Another court has announced that evidence of habit is highly probative for the purpose of showing that a person acted in conformity with his habit on a particular occasion. Reyes v. Missouri Pac. R. Co., 589 F.2d 791 (5th Cir. 1979). There the court ruled that four prior convictions for public intoxication spanning a three and one-half year period was of insufficient regularity to rise to the level of habit evidence.
In United States v. Callahan, 551 F.2d 733 (6th Cir. 1977), the court ruled that evidence of a routine practice of a construction company would be relevant, under Rule 406, in proving the conduct of the company on a particular occasion. Defendant, who was charged with extortion, should have been able to cross-examine the company's job site supervisor as to other confrontations he had with other union representatives in similar circumstances. Such evidence might have established a routine practice of the company which employed non-union workers of paying off local unions for the sake of expediency and not out of fear.
We find that the Jefferson County Health Department's habit and routine practice of obtaining signed consent forms prior to administering the vaccine was present on November 16, 1976, and that the health center acted in conformity with the habit and custom in advising Mrs. Bean of the potential adverse effects of the swine flu vaccine.

B.
Having determined that Mrs. Bean received information concerning the vaccine, we now address the issue of whether such information was sufficient to enable her to render an informed consent to be vaccinated. Defendant's Exhibit F-460 is the registration form entitled "Important Information About Swine and Victoria Influenza (Flu) Vaccine (Bivalent)." After describing the disease and the vaccine, this document discusses possible vaccine side effects and special precautions. Under possible side effects, it is stated: "Most people will have no side effects from the vaccine. However, tenderness at the site of the shot may occur and last for several days. Some people will also have fever, chills, headache or muscle ache within the first forty eight hours." Under the heading special precaution is the following:
As with any vaccine or drug, the possibility of severe or potentially fatal reactions exists. However, flu vaccine has rarely been associated with severe or fatal reactions. In some instances people receiving vaccine have had allergic reactions. You should note very carefully the following precautions:
 Children under a certain age should not routinely receive flu vaccine. Please ask about age limitations if this information is not attached.
 People with known allergy to eggs should receive the vaccine only under special medical supervision.
 People with fever should delay getting vaccinated until the fever is gone.
 People who have received another type of vaccine in the past fourteen days should consult a physician before taking the flu vaccine.
At the bottom of the sheet patients are directed to ask any questions about the flu or flu vaccine which they might have.
The signed registration form states: "I have read the above statement about swine flu and Victoria flu, the vaccine and the special precautions. I have had an opportunity to ask questions, ... and understand the benefits and risks of flu vaccination. I request that it be given to me...".

C.
Under the FTCA, the United States is only liable for the negligent or wrongful acts or omissions of its employees while acting within the scope of their office or employment. 28 U.S.C. § 1346(b). This has been interpreted to mean that the United States may not be held liable on theories of strict or absolute liability. Dalehite v. United States, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953) reh. den. 346 U.S. 841, 74 S.Ct. 13, 98 L.Ed. 363, 346 U.S. 880, 74 S.Ct. 117, 98 L.Ed. 386, 347 U.S. 924, 74 S.Ct. 511, 98 L.Ed. 1078.
*575 The Swine Flu Act only waived the government's immunity to suits based on strict liability or breach of warranty where the act or omission complained of involves a program participant. 42 U.S.C. § 247b(k)(2)(A)(i). By statute, the United States has the exclusive duty to warn each individual of the risks and benefits of the vaccine. 42 U.S.C. § 247b(j)(1)(F). Therefore, in order for a plaintiff to recover because of inadequate warning, she must prove negligence.
State law determines the standard of conduct against which acts of government agent are to be measured under the FTCA. Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972). Therefore, the law of the State of Colorado applies in the instant action. The Colorado rule on informed consent was enunciated in Mallet v. Pirkey, 171 Colo. 271, 466 P.2d 466, 473 (1970):
... The duty of the physician to disclose, however, is limited to those disclosures which a reasonable medical practitioner would make under the same or similar circumstances... So long as the disclosure is sufficient to assure an informed consent, the physician's choice of plausible courses should not be called into question.
Stated differently it is not mandatory for a physician to make full and complete disclosure under all circumstances. This is especially true when disclosure of all risks may be impractical. A physician discharges his duty to disclose when he has informed the patient of the substantial risks involved in the treatment which the physician knows or reasonably should have known existed. See Colorado Jury Instructions, 2d, Civil, 15:16. The duty to disclose is a duty imposed by laws, and does not owe its existence to community medical standards. Hamilton v. Hardy, 37 Colo.App. 375, 549 P.2d 1099, 1104 (1976), cert. den. May 3 and May 24, 1976.
A persuasive case on the question of informed consent is Canterbury v. Spence, 464 F.2d 772 (D.C.Cir.1972), cert. den. 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972), where the court held that the duty to disclose is not determined by medical custom, rather, it depends on the patient's right to know and to consent to treatment:
In our view, the patient's right of self-determination shapes the boundaries of the duty to reveal. That right can be effectively exercised only if the patient possesses enough information to enable an intelligent choice. The scope of the physician's communications to the patient, then, must be measured by the patient's need, and that need is the information material to the decision. Thus the test for determining whether a particular peril must be divulged is its materiality to the particular decision: all risks potentially effecting the decision must be unmasked. And to safeguard the patient's interest in achieving his own determination of treatment, the law itself must set the standard for adequate disclosure ... no less than any other aspect of negligence, the issue of non-disclosure must be approached from the viewpoint of the reasonableness of the physician's divulgence in terms of what he knows or should know to be the patient's informational needs. If, but only if, the factfinder can say that the physician's communication was unreasonably inadequate is an imposition of liability legally or morally justified.
Canterbury, supra, 464 F.2d at 786-787.
In determining the breadth of disclosure, an objective standard with due regard to the patient's informational needs and the physician's situation must be considered. "A risk is thus material when a reasonable person ... would be likely to attach significance to the risk or cluster of risks in deciding whether or not to forego the proposed therapy." Id. at 787.
In duty to disclose cases, the focus of attention is on the physician's divulgence rather than the patient's understanding. While adequate disclosure and informed consent are two sides of the same coin, the former a sine qua non of the latter, the physician discharges his duty when he makes a reasonable effort to convey significant *576 information to enable the patient to make a reasonably informed decision. Id., at 780, n.15.
Under both Canterbury and the Colorado standard, the patient's right to know and consent depends upon an objective determination of what information a prudent person would require in order to make an intelligent decision. To explain all the risks involved in a particular treatment might be inexpedient and confusing. Niblack v. United States, 438 F.Supp. 383, 389 (D.Colo. 1979). Here, the registration form executed by Mrs. Bean advised her of possible severe or potentially fatal reaction to the inoculation. Would the inclusion of potential neurologic disorders resulting from the vaccine be significant? We think not. A reasonable person, when informed that a treatment might lead to fatality, would not require advice concerning potential neurologic disorders in order to make an informed decision.
We find that the warning given to Mrs. Bean was sufficient to provide her with adequate information to make an informed decision as to whether she should be vaccinated. Resolving this issue adversely to plaintiff, we now consider the pivotal question of causation and the medical history of plaintiff prior to and after the swine flu immunization.

IV.

PLAINTIFF'S MEDICAL HISTORY
On the morning following her swine flu vaccination, Mrs. Bean began experiencing numbness in her left foot. Two weeks later, on November 30, plaintiff visited Gerald H. Hooper, D.O., her physician since 1971, complaining of back pain. Dr. Hooper was unable to relieve the pain with normal treatment. Plaintiff was then hospitalized by Dr. Hooper for treatment of acute sciatic neuritis and degenerative joint disease. She remained hospitalized for approximately two weeks. During that period, Mrs. Bean developed left foot drop. This condition, which all experts agree is permanent in the instant case, prevents Mrs. Bean from elevating her left foot, causing her toes to drag when she walks. She requires a leg brace to walk without stumbling.
Testimony indicates several hospitalizations of plaintiff over the past twenty years. She has an extensive history of back problems spanning more than thirty years. In the 1940's she fell while skating and injured her back; from that time on, plaintiff has had periodic bouts of back pain which have required treatment with physical therapy and traction. She has also been treated for degenerative arthritis for thirty years and has suffered from curvature of the spine and sciatica. In 1960, Mrs. Bean underwent back surgery. This was necessary to alleviate low back pain that radiated down her left foot. She also had paresthesia and burning in that foot. She apparently recovered from the operation and in 1963, began working as a beautician.
In 1967, plaintiff slipped on ice and reinjured her back. This caused her to miss several weeks of work. She continued as a beautician until 1971 when she sold her shop and retired. There is some conflict in the testimony as to the reasons for her retirement. Plaintiff asserts that she retired because she was exhausted, suffered from inner ear problems, and had recently remarried. Defendant, on the other hand, contends that Mrs. Bean retired because of leg and back pain which were aggravated by the constant standing required of a beautician. In support of this position, the government submitted Mrs. Bean's Social Security disability file (Defendant's Exhibit O). The application for benefits filed May 28, 1975, listed back problems as the reason she sold her shop in 1971. Donald Harder, M.D., examined plaintiff in connection with that application. He reported that Mrs. Bean complained of low back pain, numbness and pain in the lower left extremity, and occasional pain in the lower right leg. X-rays revealed a scoliosis (abnormal curvature) and advanced degenerative changes in the lumbar spine. It was Dr. Harder's impression that Mrs. Bean was considerably disabled as a result of back problems. Dr. Hooper also submitted a report that plaintiff *577 should not work because of the condition of her back.
From 1971 to the present, Dr. Hooper has treated Mrs. Bean for sciatica, degenerative joint disease, arthritis and vertigo. In August, 1976, when plaintiff was hospitalized for rectal surgery, Dr. Hooper was one of her treating physicians. Admission records from that hospitalization indicate that plaintiff suffered from paresthesia and numbness in the second toe of her left foot. (Defendant's Exhibit N). While hospitalized, she also complained of deep pain in her left buttock, as well as back pain.
In 1974, plaintiff was hospitalized for two weeks with severe sciatic pains on her left side. Medical records for this hospitalization indicates that Mrs. Bean had been experiencing more pain during physical activities and while standing. (Defendant's Exhibit P). In March, 1977, plaintiff was hospitalized for left leg pain. Medical records for that incident indicate that the pain began in 1975 and became acute in December, 1976.
Plaintiff's medical history reveals that she has had various problems with her left leg prior to the swine flu immunization. These problems include tingling and numbness in her left foot. In addition, she has had numerous back problems and occasional difficulty in her lower right extremities.

V.

EXPERT TESTIMONY
The testimony is in conflict as to whether the swine flu vaccine caused plaintiff's drop foot. In support of plaintiff's position, several doctors rendered their expert opinions and analyses.

A.
Martin Lewis, M.D., Chairman of the Pathology Department at Georgetown University, Washington, D.C., has conducted several studies concerning the effect of vaccination on the immune system. His testimony at trial pertained to one such test which seeks to determine a nexus between the swine flu vaccine and Guillain-Barre Syndrome (GBS). The methodology utilized involves reacting a person's blood serum with both peripheral nerve antigen and the swine flu vaccine. Dr. Lewis analyzed over 100 sera in this manner.
A summary of his findings indicates that sixty-six percent of the GBS patients who had been vaccinated demonstrated a positive reaction to both the nerve antigen and the vaccine, whereas only eight percent of the non-GBS patients evidenced two positive reactions. In Dr. Lewis' opinion, the significance of two positive reactions is that such an individual is one who had GBS or still has it and had been vaccinated.
It is urged by plaintiff that, since her blood serum yielded two positive reactions, the test results establish that she experienced GBS as a result of the vaccination. We are not persuaded that this contention is correct. Plaintiff has not established that she suffered any of the symptoms typically required for a diagnosis of GBS.[13]
Additionally, Dr. Lewis testified that the test results were preliminary and inconclusive. On cross examination, the following colloquy occurred:
"Q. Doctor, is it your opinion that, these test results ... are conclusive or lead you to believe, and state with reasonable medical certainty, that the ... illness Plaintiff experienced [was] caused by the swine flu vaccine?
A. No, that's not what I said ....
Q. ... [I]t is not your opinion that these tests show with any certainty that [this] plaintiff suffered a neurological disorder related to the vaccine; is that correct?

*578 A. I think that's the best interpretation of the results, but I can't talk with certainties on this because we have a lot more work to do yet.
Q. In fact, Doctor, these studies are very preliminary are they not, and you so testified?
A. I regard them as very preliminary ...."
(See, Test. of Dr. Lewis).
At trial the government objected to the admissibility of Dr. Lewis' testimony on two grounds. First, it contends that plaintiff has not established an adequate chain of custody with respect to the blood samples of Mrs. Bean analyzed by Dr. Lewis; and second, the tests are not the type reasonably relied on by the medical profession in formulating opinions.
We have considered and overrule defendant's objection to the testimony of Dr. Lewis. The general purpose of requiring a chain of custody to be established is to insure that evidence being offered is what the proponent claims it to be. Rule 901(a), Federal Rules of Evidence; United States v. Zink, 612 F.2d 511, 514 (10th Cir. 1980). To establish a chain of custody, the proponent must trace the continuous wherea-abouts of the item in question. Id. Here, plaintiff has submitted affidavits of: (a) the nurse who drew the blood from Mrs. Bean and mailed it to plaintiff's attorney; (b) of plaintiff's attorney's secretary who received the blood and mailed it to Dr. Phillips at Georgetown University; and (c) of Dr. Phillips who received the blood and coded it in accordance with his laboratory's usual procedures. We are satisfied that these affidavits support a continuous chain of custody of Mrs. Bean's blood samples from the time it was drawn until it was analyzed.
Rule 703, Federal Rules of Evidence, upon which defendant's second objection is based, reads as follows:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
The government bases its objection to Dr. Lewis' testimony on what we believe to be an incorrect interpretation of the second sentence of Rule 703. The thrust of the government's objection is that the medical community has not yet accepted Dr. Lewis' conclusions. It has, however, accepted the methodology in which his tests were conducted. The second sentence of Rule 703 allows experts to render opinions based upon information that otherwise might be hearsay, if this information or data is routinely relied upon by experts in the field. See, Smith v. Ford Motor Co., 626 F.2d 784, 793 (10th Cir. 1980); Bryan v. John Bean Division of FMC Corporation, 566 F.2d 541, 545 (5th Cir. 1978) (Rules 703 and 705, Federal Rules of Evidence, permits the disclosure of otherwise hearsay evidence for the purpose of illustrating the basis of the expert witness' opinion. United States v. Shields, # 77-1095 (10th Cir., March 22, 1978) (unpublished opinion) (a handwriting expert's testimony was admissible under Rule 703, even though the exemplars on which he relied were not admitted in evidence). See also, Notes of the Advisory Committee on Proposed Rules, Rule 703, Federal Rules of Evidence. Dr. Lewis, however, based his opinion upon tests conducted by laboratory personnel under his supervision. It is beyond question that physicians regularly base opinions on laboratory findings. Therefore, Dr. Lewis may base his opinion on the results of those tests.
The fact that Dr. Lewis could not state to a reasonable degree of medical certainty that the swine flu vaccine caused Mrs. Bean's illness goes to the weight we give his testimony, not to its admissibility. United States v. Cyphers, 553 F.2d 1064 (7th Cir. 1977), cert. den. 434 U.S. 843, 98 S.Ct. 142, 54 L.Ed.2d 107 (1977). Similarly, the fact that the results are preliminary, and may not generally be accepted by the medical community goes to the weight we *579 give Dr. Lewis' testimony, not to its admissibility. United States v. Jackson, 425 F.2d 574, 577 (D.C.Cir.1970), Jenkins v. United States, 307 F.2d 637, 646 (D.C.Cir.1962).
We believe the test for the admissibility of this testimony is its usefulness to the fact finder. Reference to Rule 702, Federal Rules of Evidence is helpful:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The testimony of Dr. Lewis is admissible in evidence in the case. It is useful for a better understanding of the medical issues inherent in this litigation.

B.
Charles Poser, M.D., Professor of Neurology at the University of Vermont, opined at trial that Mrs. Bean suffers from a sciatic neuropathy on her left side which was caused by the swine flu vaccine. The sciatic nervous system consists of a number of nerve roots coming out of the spinal cord in the lumbrosacral area. In essence, it provides nerve and motor impulses to the legs and feet. Dr. Poser testified that the vaccine had a demyelinating effect on the sciatic nerve. This demyelination[13a] caused plaintiff's drop foot.
Dr. Poser based his medical opinion on an examination of Mrs. Bean, a review of her medical records, and medical history related by plaintiff. The medical records indicate that Mrs. Bean complained of pain and numbness in her left leg and foot on three separate occasions. Significantly, Mrs. Bean told Dr. Poser that she had not had any left side problems prior to being vaccinated on November 16, 1976. In formulating his opinion, Dr. Poser relied on the facts as recited by Mrs. Bean rather than those contained in her medical records.
Plaintiff's final expert witness was Richard Baisel, M.D., a specialist in orthopedic surgery. He examined plaintiff on December 3, 1976, and testified that she suffered from nerve root irritation rather than nerve root compression at that time. In his opinion, nerve root irritation does not cause drop foot. Dr. Baisel did not render an opinion as to whether the swine flu vaccination caused plaintiff's drop foot.

C.
One expert testified that there was no connection between the immunization and the injuries and ailments claimed by plaintiff. Steven Ringel, M.D., Professor of Neurology at the University of Colorado Health Center, conducted a physical examination of Mrs. Bean and reviewed her medical records. He explicitly testified that the disorder suffered by plaintiff was not Guillain-Barre Syndrome. In his opinion, the swine flu vaccine had no relation to plaintiff's foot drop and did not aggravate or contribute to her condition. He further stated that plaintiff's foot drop was caused by chronic back ailments and arthritis; that in particular, it is caused by chronic "L-5, S-1"[14] problems, which x-rays indicate plaintiff suffers from.

VI.

THE LAW OF CAUSATION
Under the Federal Tort Claims Act, the United States is liable "for injury ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b), 2674. In the instant action, the applicable law is that of the State of Colorado.
*580 Under Colorado law, an event is the proximate cause of another's damage if in the natural and probable sequence of things, it produced the claimed injury. If more than one cause contributed to the alleged injury, then each cause may be considered a proximate cause. A proximate cause need not have been the only cause or the last or nearest cause. Such event is sufficient if it concurs with some other event, either in combination with it or separately, to cause the claimed injury. Reaves v. Horton, 33 Colo.App. 186, 518 P.2d 1380 (1973), rev'd in part on other grounds 186 Colo. 149, 526 P.2d 304 (1974) Winkler v. American Safety Equipment Corp., 604 P.2d 693 (Colo.App.1979). See also, Colorado Jury Instruction 2d, Civil 9:26 and 9:28. In Moore v. Standard Paint and Glass Co. of Pueblo, 145 Colo. 151, 358 P.2d 33 (1969), the Colorado Supreme Court reiterated the "but for" test of causation initially adopted in Denver v. Johnson, 8 Colo.App. 384, 46 P. 621, 623 (1896). The rule was stated as follows:
"[W]here several concurring acts or conditions of things  one of them the wrongful act or omission of the defendant  produces the injury and it would not have been produced but for such wrongful act or omission, such wrongful act or omission is the proximate cause of the injury..."
145 Colo. 151, 358 P.2d 36.
In the instant case, if plaintiff establishes that the swine flu vaccination aggravated her previous back problems thereby causing her drop foot or that the vaccine singly caused the drop foot, then the vaccination is the proximate cause of her condition.
All that is necessary to establish a causal connection between the inoculation and plaintiff's illness is to show facts and circumstances as would indicate with a reasonable probability that the drop foot resulted from, or was precipitated by the vaccine. Widefield Homes, Inc. v. Griego, 160 Colo. 225, 416 P.2d 365 (1966); Industrial Commission v. Royal Indemnity Co., 124 Colo. 210, 236 P.2d 293, 295 (1951); O'Connor v. Boulder Colorado Sanitarium Assn., 107 Colo. 290, 111 P.2d 633, 634-35 (1941); Ringsby Truck Lines v. Industrial Commission, 30 Colo.App. 224, 491 P.2d 106 (1971).

VI.

BURDEN OF PROOF
Plaintiff has the burden of proving by a preponderance of the evidence that the swine flu vaccine was the proximate cause of her drop foot. Exchange National Bank of Colorado Springs v. Sparkman, 191 Colo. 534, 554 P.2d 1090, 1092 (1976). While plaintiff presented the testimony of widely respected doctors, we are not persuaded that she has met her burden of proof. We have found nothing persuasive in the evidence establishing a causal connection between drop foot and the swine flu vaccine. Additionally, two of the experts who testified in support of plaintiff's position (Dr. Lewis and Dr. Baisel) were unable to state with a reasonable degree of medical certainty that the inoculation caused plaintiff's condition. Dr. Lewis' serum analysis is not persuasive in the instant case. It purports to establish a relationship between the vaccine and Guillain-Barre Syndrome. In his own words, the study is preliminary and inconclusive.
The only remaining opinions are those of Drs. Poser and Ringel. We believe that the process of reasoning by which Dr. Ringel supports his opinion convinces the Court that his opinion is entitled to greater weight. Based on the more persuasive evidence, we find that plaintiff has not established that the swine flu vaccination caused Mrs. Bean's condition or in any way contributed to her drop foot. Simply stated, the vaccination was not the proximate cause of plaintiff's injury.

CONCLUSION
We find and conclude that plaintiff has failed to establish by a preponderance of the evidence that the injuries she sustained were caused by the immunization. Several possible causes of drop foot have been advanced, however, in our role as trier of fact, *581 we are led to the inescapable conclusion that the evidence presents no more than equal probabilities as to the cause of Mrs. Bean's condition. All that has been shown here is a temporal relation; and that is insufficient to carry the burden of proof which rests upon plaintiff.

ORDER
We find the issues joined in favor of defendant, United States of America, and against plaintiff, Ellen Bean. The Clerk of the Court is directed to enter judgment in favor of defendant and against plaintiff and the complaint and action are dismissed. Each party to pay its or her own costs.
This Order constitutes the findings of fact and conclusions of law as required by the Federal Rules of Civil Procedure, Rule 52(a).
NOTES
[1] The National Swine Flu Immunization Program of 1976, Public Law 94-380; 42 U.S.C. § 247b (Swine Flu Act) establishes the Federal Tort Claims Act (FTCA) the vehicle for asserting claims against the United States arising out of the swine flu program.
[2] This section, commonly known as the discretionary function exemption, insulates rulemaking functions of administrative branches from tort liability. Miller v. United States, 378 F.Supp. 1147 (D.Ky.1974), aff'd 522 F.2d 386 (6th Cir. 1974).
[3] Suits under the Federal Tort Claims Act are to be tried without a jury, 28 U.S.C. § 2402. This non-jury provision has been held constitutional, McElrath v. United States, 102 U.S. 426, 26 L.Ed. 189 (1880).

Several courts have spoken on issues relating to the Swine Flu program. Sparks v. Wyeth Laboratories, 431 F.Supp. 411 (W.D.Okl.1977), aff'd per curiam (10th Cir. Dec. 22, 1978) (unpublished opinion), upheld the Swine Flu Act against an argument that it violated the Seventh Amendment. That Court stated at p. 418 "it is axiomatic that if a cause of action can be abolished [the court had ruled that the abolition of the cause of action against the program participants did not violate due process], the jury trial of that action is also abolished. The elemental fact is that suits against the sovereign were unknown as common law. Thus, perforce, there was no right of jury trial against the sovereign at common law."
The constitutionality of the Swine Flu Act was also upheld in Jones v. Wyeth Laboratories, Inc., 583 F.2d 1070 (8th Cir. 1978), and Ducharme v. Merrill National Laboratories, 574 F.2d 1307 (5th Cir. 1978). In Overten v. United States, 619 F.2d 1299 (8th Cir., 1980), another swine flu case, the court held that in order for funds to be considered collateral to an FTCA damage award, the plaintiff must demonstrate that he has contributed to the fund which he claims as a collateral source. The court upheld the damage award but deducted medicare payments received by plaintiff.
[4] Administration of the National Influenza Immunization Program of 1976., Final Report to Congress by Department of Health, Education and Welfare (H.E.W.) (1978).
[5] A program participant includes anyone who manufactured, distributed or administered the swine flu vaccine. 42 U.S.C. § 247b(k)(1)(A)(i).
[6] It was widely thought by epidemiologists that antigenic shifts in the influenza virus were likely about once every decade. There had been shifts in 1957 and 1968 both followed by pandemics  Asian Flu and Hong Kong Flu respectively  and public health officials were expecting another by 1978 or 1979. Neustadt and Fineberg, The Swine Flu Affair, published by the Department of Health, Education and Welfare, 1978, p.6.
[7] Id. at 147.
[8] The insurers contended that it is the cost of investigating and litigating frivolous suits that prevent them from insuring against strict liability in tort. Id. 58-59.
[9] Over one hundred fifty such suits have been filed in the judicial districts comprising the Tenth Circuit, i.e., Colorado, Kansas, New Mexico, Oklahoma, Utah and Wyoming.
[10] Typically, under the FTCA, before bringing suit a claimant must have first presented his claim to the appropriate Federal agency and the claim must either be denied or receive no final disposition by the agency, 28 U.S.C. § 2675(a). However, under the Swine Flu Act (42 U.S.C. § 247b(k)(2)(A)(iii)) if an action is brought within two years of the date of the administration of the vaccine and is dismissed because the plaintiff did not file an administrative claim, the plaintiff has thirty days from the date of dismissal or two years from the date the claim arose, whichever is later, in which to bring the claim.
[11] 28 U.S.C. § 1346(b) provides that the United States shall be liable to the same extent as a private person would be under the laws of the place where the act or omission occurred. Therefore, Colorado law respecting causation is the proper yardstick in this litigation.
[12] The bivalent vaccine was designed to provide immunization against the swine flu and A/Victoria flu whereas, the monovalent vaccine only provided protection against the swine flu.
[13] Defendant's Exh. A-589 is the criteria established by an ad hoc committee of the National Institute of Neurological Communicative Disorders and Stroke (NINCDS) for the diagnosis of Guillain-Barre Syndrome. Symptoms required for a diagnosis are bilateral motor weakness and loss of tendon reflexes. Symptoms strongly supportive of the diagnosis include: symmetry of motor debility; progressive weakness; mild sensory symptoms; bilateral facial weakness; and recovery beginning two to four weeks after progression of the disorder ceases.
[13a] Demyelination is a process by which the myelin sheath (the fat like substance which forms a sheath around certain nerve fibers) is destroyed. This results in impaired nerve conduction. See, Test. of Dr. Poser.
[14] L-5, S-1 refers to the fifth lumbar vertebrae and the first vertebrae of the sacrum. It is positioned where the lower back meets the pelvic area.