**Darlene BRAZZELL, Appellee,**

v.

**UNITED STATES of America,
Appellant.**

**No. 85–1698.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 11, 1986.

Decided April 18, 1986.

Order on Rehearing July 31, 1986.

that under Iowa law, the National Swine Flu Immunization Program Act, and the Federal Tort Claims Act, the government was strictly liable for the failure to warn appellee about the risk of contracting severe and prolonged muscle soreness as a side effect of the swine flu vaccination.

On appeal, the government argues that the district court erred in these respects: finding appellee's action timely; applying Iowa strict liability law; finding that the vaccination was the actual cause of appellee's injuries; and holding that the failure to warn was the proximate cause of appellee's injuries.

We hold that the action was timely; that the district court properly construed our prior holdings on Iowa strict liability law; and that the district court did not err in its analysis of causation. We affirm.

---

Robert L. Teig, Asst. U.S. Atty., Cedar Rapids, Iowa, for appellant.

Wilford M. Forker, Sioux City, Iowa, for appellee.

Before HEANEY, BOWMAN and TIMBERS,[*] Circuit Judges.

TIMBERS, Circuit Judge.

The United States ("government") appeals from a judgment entered April 4, 1985 in the Northern District of Iowa, Donald E. O'Brien, *Chief Judge*, after a bench trial holding the government liable in amount of $33,482.95 for injuries sustained by Darlene A. Brazzell ("appellee") as a result of receiving a swine flu vaccination in November 1976. The district court held

## I.

We summarize only those facts believed necessary to an understanding of the issues raised on appeal.

Much has been written regarding this country's reaction to the threat of a swine flu epidemic in 1976. *E.g., Petty v. United States,* 679 F.2d 719, 724–27 (8th Cir.1982) (*"Petty I"*); *Bean v. United States,* 533 F.Supp. 571–72 (D.Colo.1980); *In re Swine Flu Immunization Products Liability Litigation,* MDL # 330, Misc. No. 78–0040 (D.D.C.1979) (multidistrict litigation pretrial order). We assume familiarity with this background and therefore we shall set forth only the essentials of the swine flu immunization program as they relate to the instant appeal.

In response to the perceived threat of an epidemic of swine flu in 1976, Congress, at the Ford Administration's prompting, en-

---

[*] The Hon. William H. Timbers, Senior United States Circuit Judge for the Second Circuit, sitting by designation.

acted the National Swine Flu Immunization Program Act, former 42 U.S.C. §§ 247b(j)–247b(*l*) (1976) ("Swine Flu Act"). The Swine Flu Act was designed to make it possible for all adults to receive a free swine flu vaccination. In order to ensure a plentiful supply of vaccine and medical personnel to administer it, the Swine Flu Act provided that all personal injury claims arising out of swine flu vaccinations were to be brought against the United States. The government assumed the liability of all program participants, which included vaccine manufacturers and the medical personnel who gave the vaccinations. The government's liability was to be governed by the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680 (1982), except that, if asserted liability was predicated on any acts by participants in the program other than the government, such liability might be grounded on any theory available in the state where the vaccination was given. 42 U.S.C. § 247b(k)(2)(A)(i).

Appellee, after observing much of the government's positive publicity on the program, consulted her family doctor to inquire about the advisability of receiving a vaccination. Her doctor advised her that, because of her past history of tuberculosis, she was in a high risk group in being exposed to swine flu and ought to get the vaccination. On November 11, 1976 appellee received the vaccination at her doctor's office in Sioux City, Iowa. Appellee did not see her doctor when she received the vaccination, but was attended to by a nurse. Just prior to receiving the vaccination, appellee was given two printed forms that had been supplied to the doctor by the government. One form gave information on the vaccine, stressing its safety but including a warning about side effects. The other form, which appellee signed, recited that she had read the information form and had been given an opportunity to ask questions. *Petty I, supra,* 679 F.2d at 722–23 (forms reproduced).

On November 15, 1976 appellee telephoned her doctor complaining of aches, chills and a fever. The doctor recommended aspirin. On November 19 appellee again called her doctor complaining of no relief. The doctor prescribed a strong muscle relaxant. On November 21 appellee visited her doctor complaining of intense muscle pain throughout her entire body, a condition termed "myalgia". The doctor admitted her to a hospital for tests. Appellee remained in the hospital from November 21 to December 8. The hospital records covering this stay indicate that appellee's doctor thought appellee's myalgia was "probably secondary" to having had the swine flu vaccination. In his deposition, the doctor stated that he thought he had told appellee of this preliminary diagnosis while she was in the hospital. Although appellee's condition improved, she continued to suffer muscle pain. She saw her doctor on December 22, 1976 and January 5, 1977. At the latter visit, appellee expressed her belief that the vaccination had caused her troubles. Her doctor, having changed his mind since her hospital stay, assured her that the vaccination's effect had long since worn off. Around this time appellee also began experiencing emotional stress characterized by "tenseness". This tenseness became increasingly severe. Appellee sought the aid of a psychiatrist. The psychiatrist admitted her to a hospital where she remained from April 16, 1977 to May 25, 1977. The psychiatrist concluded that appellee was suffering from anxiety neurosis and depression. In his deposition he stated that the physical stress attendant upon appellee's myalgia was a direct contributing factor of her neurosis. Appellee was still suffering from some symptoms of both myalgia and anxiety neurosis at the time of trial in March 1982.

On February 8, 1980, after discussing with a lawyer the circumstances surrounding her vaccination, appellee filed an administrative claim against the government

for injuries she claimed resulted from her vaccination. On September 24, 1980, after her administrative claim was denied, appellee commenced the instant action in the district court under the Swine Flu Act and the Federal Tort Claims Act. Appellee's complaint alleged that the government was liable for the myalgia and anxiety neurosis she contracted as a result of the vaccination because program participants had failed to warn her of the risks of such maladies. The complaint sounded in negligence, strict liability and breach of warranty.

At the bench trial the most significant evidence presented consisted of depositions of appellee, her doctors and the government's doctors. The court also relied on certain factual findings made in the final pretrial order of the District Court for the District of Columbia, where the Judicial Panel on Multidistrict Litigation had sent many of the swine flu cases for coordinated discovery. *In re Swine Flu Immunization Products Liability Litigation, supra.* In an unreported opinion dated April 4, 1985,[1] the district court held the government strictly liable for appellee's injuries. The court considered only appellee's strict liability theory for failure to warn of possible side effects because it determined that complete relief could be awarded under that theory. The court found that the vaccination was the actual cause of appellee's myalgia and that the myalgia was a contributing factor in appellee's anxiety neurosis. The court held that under Iowa strict liability tort law the vaccine's manufacturer and appellee's doctor had a duty to warn appellee of the risk of myalgia and had breached that duty. The court held that this failure to warn was the proximate cause of appellee's injuries because the government had failed to rebut a burden shifting presumption which presumes that

the failure to warn is the proximate cause in swine flu vaccination cases. The court held the government, in lieu of the program participants, liable to appellee in accordance with the Swine Flu Act. The court awarded appellee $30,000 for past pain and suffering but awarded no damages for permanent injuries. The court also awarded $3,482.95 in unrecompensed medical expenses.

## II.

With this background of facts and prior proceedings in mind, we shall consider the government's arguments seriatim.

### A. *Action's Timeliness*

The government argues that appellee's action was time barred under the limitations period for the Federal Tort Claims Act. For a tort action against the government to be timely, the plaintiff must file an administrative claim with the appropriate agency "within two years after such claim accrues." 28 U.S.C. § 2401(b). When a claim accrues under the Tort Claims Act is a matter of federal law. *Snyder v. United States,* 717 F.2d 1193, 1195 (8th Cir.1983). Although the choice of the appropriate rule for determining when a claim accrues is a matter of law, a district court's findings on the application of that rule are findings of fact and will not be disturbed unless clearly erroneous. *Reilly v. United States,* 513 F.2d 147, 150 (8th Cir.1975).

The government's argument that appellee's action was untimely is two-tiered. First, the government argues that the court applied the wrong rule as to when a claim under the Swine Flu Act accrues. The court held that appellee's claim accrued on the date she discovered or

---

**1.** Judge O'Brien reserved decision in the instant case pending the outcome of the second appeal of the *Petty* case. *Petty v. United States,* 740 F.2d 1428 (8th Cir.1984) *("Petty II").*

should have discovered that the vaccination was the cause of her injuries. This discovery rule is in sharp contrast to the more usual date of injury rule, which is simply that the claim accrues at the time of discernible injury, usually the same time as the causitive act. *Wollman v. Gross,* 637 F.2d 544, 547 (8th Cir.1980) (general rule for claim accrual under the Tort Claims Act is date of injury). The government argues that the date of injury rule should have been used in the instant case. We agree with the court that appellee's case presented an appropriate situation for using the ameliorative discovery rule. We have held that the timeliness of a medical malpractice claim under the Tort Claims Act is to be determined by the discovery rule. *Reilly v. United States, supra,* 513 F.2d at 149. While in one sense appellee's claim sounds in products liability, that classification cannot destroy the medical context of the case. As with most medical malpractice claims, the true cause of appellee's injuries was clouded by conflicting medical advice. Although appellee's doctor initially told appellee that he thought her muscle soreness was a result of the vaccination, he later reversed himself and told her that the vaccination could not be the cause of her continued suffering. Also, the elusive nature of the injury, with its varying degrees of severity, made pinpointing the real cause tricky.[2] We hold that the court did not err in choosing the discovery rule to determine when appellee's claim accrued.

The government's second argument regarding the asserted untimeliness of the action is that, even under the discovery rule, appellee's claim is time barred because she should have discovered the cause of her injuries well before February 8, 1978, i.e. two years prior to her administrative claim. The court's findings of fact as

to when appellee could have discovered the cause of her injury will not be disturbed unless clearly erroneous. *Reilly v. United States, supra,* 513 F.2d at 150. The court found that, although appellee was "painfully aware" of her injuries immediately after receiving the vaccination and continued through January 1977 to think that the vaccination caused her injuries, such thoughts were only "speculation" and could not be substantiated by medical opinion. The court found that appellee could be charged with the ability to discover the cause of her injuries only after her doctor had concluded that the vaccination was the culprit. Appellee's doctor testified that he did not decide with a reasonable degree of medical certainty that the vaccination caused appellee's myalgia until "some three or four years" after appellee reported symptoms. The court concluded, therefore, that the earliest appellee's claim could have accrued was November 15, 1979, three years after her first post-vaccination complaint. Since appellee's administrative claim was filed within two years of this date—on February 8, 1980—the court found the action timely.

Although a close question, we hold that the court's findings are not clearly erroneous. The court was correct in disregarding appellee's suspicions about the cause of her injuries. Appellee was advised by her doctor in January 1977 that the vaccination could not be the cause of her continued suffering. In the face of this advice, it would be unfair to charge appellee with reason to know differently. As to when appellee should have discovered the cause of her injuries, we believe that she ought to be charged with that knowledge as soon as she could have discovered the vaccination was the cause by asking a doctor. In *United States v. Kubrick,* 444

---

**2.** The government argues that, because appellee began feeling symptoms the day after receiving the vaccination, we should apply the date of injury rule. Later in its brief, however, the government argues that the temporal proximity of the vaccination and the onset of symptoms is insufficient to show actual causation. Agreeing with this latter view, we do not believe that the quick onset of symptoms, when coupled with the conflicting diagnoses by appellee's doctor, is enough to require abandoning the discovery rule.

U.S. 111 (1979), the Supreme Court held that a plaintiff must be charged with the knowledge that a particular medical procedure was the cause of his injuries when by "inquiry among doctors with average training and experience in such matters" the plaintiff could have discovered the cause. *Id.* at 123. In the instant case, we agree with the district court that such inquiry would have been fruitless at least until appellee's own doctor had determined the cause of her injuries. This is because there was undisputed evidence below that appellee's vaccine-induced myalgia was probably the only such case in the country—that is, no other doctor would have had a basis for making the connection more quickly or more certainly than appellee's doctor. Also, appellee's doctor, being the one most familiar with her medical history and the circumstances of her myalgia, was in the best position to discover its cause. While in many cases the treating physician may have reason not to search diligently for the cause of an injury—for fear of impugning his own conduct—appellee's doctor had no such worries in finding the vaccine to be the cause.

While a trial court might be tempted to find that appellee should have filed her claim earlier in view of the immediate and serious nature of her symptoms, as an appellate court we decline to say that the court's findings on appellee's ability to determine the cause of her injuries are clearly erroneous.

We hold that the court was correct in determining appellee's action to be timely.

## B. *Iowa Strict Liability Tort Law*

The government argues that the court misconstrued Iowa strict liability tort law and our application of that law to the swine flu innoculation program in *Petty II, supra,* 740 F.2d at 1439–41.[3] Under the Swine Flu Act, since the vaccination was given in Iowa, Iowa law governs the government's liability when it stands in the place of a program participant like the vaccine manufacturer or the administering physician. 42 U.S.C. § 247b(k)(2)(A)(i). The court reached only appellee's strict liability theory claim based on the failure of the vaccine manufacturer and that of the doctor to warn of the risk of myalgia; so that is all we need review.

In *Petty II* we had occasion to construe Iowa tort law as it applied to a strict liability claim based on the failure of a swine flu vaccine manufacturer to warn of the risk of serum sickness. In reviewing Chief Judge O'Brien's judgment in that case for the plaintiff on both negligence and strict liability theories, we held that the court correctly had predicted what the Iowa courts would do with similar claims. After affirming the court's application of Iowa negligence law, we affirmed the court's analysis of Iowa strict liability tort law in an alternative holding.[4] We held that the Iowa courts would hold a vaccine manufacturer strictly liable for its failure to warn ultimate consumers, who received the vaccine at a mass immunization center, about the risk of dangerous side effects of the vaccine. We held that, once causation had been proven, regardless of whether the manufacturer knew of the particular risk

---

**3.** The government also urges that we overturn *Petty II* because, in the government's view, we erroneously predicted Iowa law. The government appears to have forgotten a cardinal principle of appellate jurisprudence. Absent special circumstances, such as a clear pronouncement on strict liability tort law from the Iowa Supreme Court, this panel has neither the power nor the inclination to overturn the decision of another panel of this Court. Since no such circumstances exist, we adhere to *Petty II.*

**4.** The government argues that *Petty II*'s discussion of Iowa strict liability tort law is non-binding dicta. A careful reading of the opinion, however, indicates that we intended our analysis of strict liability law to be a binding alternative holding. *Petty II, supra,* 740 F.2d at 1441 ("Accordingly, in addition to holding the government liable for its own negligence, we alternatively hold the United States liable for [the vaccine manufacturer's] liability under strict liability.") (footnote omitted).

involved or whether the risk was foreseeable, knowledge of the risk would be imputed to the manufacturer under a strict liability theory. *Petty II, supra,* 740 F.2d at 1441. After causation has been established, therefore, the only questions that remain are whether a manufacturer with the imputed knowledge of the risk had a duty to warn the ultimate consumer of that risk and whether the warning actually given was adequate. *Id.*

In the instant case the court, after establishing causation,[5] correctly concerned itself with the crucial questions of the duty of the program participants to warn of the risk of myalgia and whether the warnings appellee received were adequate. As for the duty to warn, the court held that both the vaccine manufacturer and the doctor with their imputed knowledge had a duty to warn appellee of the risk of myalgia. This is an extension of our holding in *Petty II,* and we think it is an appropriate one. It is clear that the risk of prolonged, debilitating muscle pain is the type of dangerous risk which requires a warning. The remaining questions are who had the duty to warn and to warn whom. In *Petty II* we held that the vaccine manufacturer had a duty to warn the ultimate consumer who received the vaccine at a mass immunization center without the advice of a "learned intermediary".

In the instant case appellee did have the help of her doctor. The doctor testified, however, that he knew nothing more about the vaccine than what the manufacturer and government had told him. We hold that the doctor's intervention is not enough to dispel the manufacturer's duty to warn the ultimate consumer in view of the swine flu program's exigent circumstances. The program was designed by the government to be at an emergency pitch and it gave physicians little chance to investigate the vaccine they were administering. The only possible sources of information on the vaccine were the manufacturer and the government who had developed and tested it. The manufacturer, therefore, properly is charged with the duty to warn doctors and consumers of the risks involved. Moreover, the doctor in a swine flu vaccination case also must be charged with a strict duty to warn of serious risks. We have little trouble in viewing doctors in the program, rather than learned intermediaries, as distributors of a defective product. As stated above, the emergency nature of the program forced this role on them. We conclude, therefore, that the court was correct in holding that both the vaccine manufacturer and appellee's doctor had a duty to warn appellee of the risk of myalgia, knowledge of that risk being imputed to them.

As to whether either the manufacturer or doctor breached this duty by not adequately warning appellee about the risk of myalgia, we have no difficulty in affirming the court's finding that no adequate warning on myalgia was given by either the manufacturer or the doctor. The only warning appellee was given was in the information sheet she received on the day of the vaccination. This sheet, like the government's media campaign, stressed the safety of the vaccine. It did warn that some people might experience muscle aches "within the first 48 hours", but, as the court concluded, it in no way warned of the possibility of prolonged, debilitating muscle pain.[6] Under the Swine Flu Act, the government must assume liability for the breach of duty by the program participants. 42 U.S.C. § 247b(k)(2)(A)(i).

---

**5.** *See* causation discussion, Section II, subsections C and D *infra.*

**6.** The government argues that the warnings were adequate because the risk of myalgia was unforeseeable. The government misperceives strict liability law. As stated above, under a strict liability theory we must impute knowledge of the risk of myalgia to the program participants and then ask if proper warnings were given. In the case of an unforeseeable risk the answer usually will be no, but that is the nature of strict liability tort law.

We hold, therefore, that the court correctly applied the principles of Iowa strict liability tort law, as announced by us in *Petty II*, to appellee's case of failure to warn of the risk of myalgia associated with receiving a swine flu vaccination.

## C. *Actual Cause*

Although the distinction between actual cause and proximate cause is sometimes an elusive one, in the instant case we view actual cause as proof that the vaccination was the "but for" cause of appellee's injuries. Proximate cause, on the other hand, requires proof that the breach of duty complained of—the failure to warn of the risk of myalgia—not only caused appellee's injuries, but was not such an attenuated cause as to make the imposition of liability based on that breach of duty somehow unfair.

The government argues that the court erred in finding that the vaccination was the actual cause of appellee's injuries. The court's findings on actual cause are findings of fact and will not be disturbed unless clearly erroneous. *Petty I, supra,* 679 F.2d at 729. The government argues that the court erroneously based its finding of actual cause on the opinion of appellee's doctor which in turn was erroneously based on only the temporal proximity of the vaccination and the onset of appellee's injuries. The court directly addressed this argument and rejected it. We agree. While it is true that the court based its finding that the vaccination caused appellee's injuries on the testimony of appellee's doctor, it is not true that the doctor used only the temporal proximity of the vaccination and appellee's symptoms to form his opinion. Appellee's doctor testified that, based on his observations of appellee, his three year study of the medical literature on the effects of the vaccine, and the temporal proximity of the vaccination and appellee's symptoms, he believed to a reasonable degree of medical certainty that the vaccination caused appellee's myalgia. Likewise, appellee's psychiatrist testified that, based on his observations of appellee, the physical stress caused by the myalgia contributed to appellee's anxiety neurosis. The government's doctors, only one of whom had examined appellee, did not effectively rebut the testimony of appellee's doctors. The government's doctors appear to have focused only on whether the myalgia contributed to appellee's anxiety neurosis and not on the cause of the myalgia. We do not believe that the court committed clear error in crediting one set of witnesses over the other. Moreover, although it might have been error to rely only on the temporal proximity of the injury and the vaccination, we believe the court quite properly could have considered this proximity when making its finding on actual cause.

We hold that the court's finding that the vaccination was the actual cause of appellee's injuries is not clearly erroneous.

## D. *Proximate Cause*

The government argues that the court erred in holding that the failure to warn of the risk of myalgia was the proximate cause of appellee's injuries. Under Iowa law a plaintiff generally must satisfy a subjective proximate cause test, that is, he must show that, had he been given adequate warnings, he would not have permitted the vaccination to be given. *Petty II, supra,* 740 F.2d at 1437. In *Petty II,* however, we expressly approved of a proximate cause burden shifting presumption in swine flu vaccination cases. We held that the Iowa courts would presume that the lack of warnings proximately caused the injury unless the government rebuts the presumption. *Id.* at 1438. We held that such a rebuttable presumption was appropriate for three reasons: (1) in a mass immunization setting without the advice of a doctor, warnings would not have been very helpful; (2) public policy favors placing the risk of loss on the manufacturers, not on the consumers; and (3) the government's "hard sell" of the swine flu program minimized the impact of any warning. *Id.*

Here, the court, although conceding that the first factor was not present, used the presumption because it found that the third factor was the most important in this particular case. While this extension of *Petty II* presents another close question, in view of the deference with which we re-

view a court's predictions of state law, we uphold the court's use of the presumption. As stated above, although appellee received the vaccination at her doctor's office, there was little chance for the "individualized balancing of risks and benefits" that the *Petty II* court found lacking in the mass immunization setting. *Petty II, supra,* 740 F.2d at 1438. While appellee's doctor told her that she was in a high risk group for swine flu, he did not inform her of the serious risks involved in receiving the vaccination. Also, the public policy concerns stated in *Petty II* have not changed. Iowa law still would seek to place the risk of loss on the party in the best position to distribute it. Finally, we agree with the court that the government's "hard sell" program was especially significant in appellee's case. Appellee testified that she was greatly influenced by the government's media campaign, particularly in seeing President Ford receive the "first vaccination". It does not seem inequitable to place on the government the burden of showing that the lack of adequate warnings was not the proximate cause of appellee's injuries after the government went out of its way to frighten and cajole appellee into receiving the vaccine.

We hold that the court's use of the proximate cause burden shifting presumption approved of in *Petty II* was permissible. Since the government made almost no attempt to rebut this presumption, we affirm the court's holding that the lack of adequate warnings on the risk of myalgia was the proximate cause of appellee's injuries.

### III.

To summarize: We hold that the court properly found appellee's action timely. The court did not err in using a discovery rule for claim accrual in this medical malpractice based products liability action. The court's findings on when appellee could have discovered the cause of her injuries are not clearly erroneous. We also hold that the court properly applied Iowa strict liability tort law as announced by us in *Petty II.* Although the instant case required some extensions of the principles announced in *Petty II,* we cannot say that the court erroneously predicted what the Iowa courts would do in appellee's case. We also hold that the court's finding that the vaccination was the actual cause of appellee's injuries is not clearly erroneous. The court's reliance on the opinions of appellee's doctors on actual cause was reasonable. Finally, the court did not err in holding that the failure to warn of the risk of myalgia was the proximate cause of the injuries. The court's use of the proximate cause burden shifting presumption approved of in *Petty II* is supportable. We therefore affirm the court's judgment in favor of appellee and against the government for injuries appellee suffered as a result of receiving a swine flu vaccination. Congress specifically abrogated the government's immunity in this area and provided that state liability law should govern. Since Iowa's strict liability tort law is particularly strict, the government properly was held liable to appellee for her injuries.

Affirmed.

BOWMAN, Circuit Judge, concurring.

I agree that the District Court correctly applied the Iowa law of strict products liability as construed by this Court in *Petty v. United States,* 740 F.2d 1428 (8th Cir. 1984) (*Petty II* ). Thus I concur in today's decision. The case is a troubling one, however, because our decision, along with *Petty II,* stands for the proposition that a vaccine manufacturer can be held liable for failing to warn of a risk that was unknown (and perhaps unknowable) to the manufacturer at the time the plaintiff received the vaccine. The manufacturer's liability apparently does not depend upon a showing that the vaccine was dangerously defective, but rather flows solely from the fact that the vaccine causes the plaintiff harm of a kind that the manufacturer has not warned against. The door thus is open for the imposition of liability based upon the plaintiff's idiosyncratic reaction to a vaccine,

 

even if the vaccine is defect-free.[1] The effect of this is to make vaccine manufacturers insurers against all adverse consequences, no matter how unforeseeable or unusual they may be, that result from the use of the vaccine.

Such a draconian rule of strict liability strikes me as being unwise, since it seems inevitable that this approach will tend to discourage the development and marketing of vaccines and other useful medicines. For example, between 1968 and 1977 more than half of the manufacturers of vaccines in the United States left the market. Recently, two manufacturers of the DTP vaccine, a vaccine for diptheria, tetanus, and pertussis, ceased production, leaving only one company to produce this crucial product. *See* Kitch, *Common Law Threatens the Children,* Virginia Law School Report 10, 11 (Spring 1985). The threat this trend poses to efforts to contain the spread of infectious disease is obvious. I believe it is high time for lawmakers in Iowa and throughout the nation to re-examine this disturbing trend in the law of strict products liability, lest the ability to produce and market beneficial vaccines be lost.

### ORDER ON PETITION FOR REHEARING

Appellant having filed in this Court on July 1, 1986 a petition for rehearing with a suggestion for rehearing en banc with respect to the decision of this Court which was filed April 18, 1986, 788 F.2d 1352, and the Court having given due consideration to said petition, and believing that in the orderly administration of justice the following action should be taken on the petition for rehearing addressed to the panel, it is therefore ORDERED, ADJUDGED and DECREED as follows:

(1) That the judgment dated April 18, 1986 and entered the same day in the office of the Clerk of this Court is vacated.

(2) That the case is remanded to the district court for reconsideration in light of

*Moore v. Vanderloo,* 386 N.W ^.^ 108 (Iowa April 16, 1986), and for adjudication of appellee's alternative grounds for relief which have not been ruled upon by the district court, e.g. negligence and breach of warranty. *See* 788 F.2d at 1355.

(3) That, upon remand the district court should make such additional findings of fact and conclusions of law that it considers appropriate.

(4) That, upon remand the district court may hold such further hearings and receive such additional evidence as it considers appropriate.

(5) That in due course the district court shall enter a fresh judgment from which any aggrieved party may take a timely appeal.

(6) That this panel reserves jurisdiction to hear and decide any further appeal or appeals in this case.

(7) That, to the extent provided above, the petition for rehearing is granted; in all other respects the petition is denied.

---

1. An intensive, hospital-based study indicates that approximately 3.6% of all drug exposures engender an adverse reaction which requires responsive treatment. *See* Jick, *The Boston Collaborative Drug Surveillance Programme,* reprinted in *Adverse Drug Reactions* 61, 64 (D. Richards & R. Randel eds. 1972). Thus, the scope of potential liability for drug and vaccine manufacturers as a result of adverse drug reaction is enormous.