**Dicie Ellen Hibley SWAYZE, Legal Guardian and Next Friend of Michael Wayne Swayze, Plaintiff-Appellant,**

v.

**McNEIL LABORATORIES, INC., Defendant-Appellee.**

No. 85–4894.

United States Court of Appeals, Fifth Circuit.

Jan. 9, 1987.

Rehearing and Rehearing En Banc Denied Feb. 6, 1987.

**465**

Goldberg, Circuit Judge, filed dissenting opinion.

George Gore, Arter & Hadden, Cleveland, Ohio, Easterling & Varnado, S. Wayne Easterling, Hattiesburg, Miss., for defendant-appellee.

Before GOLDBERG, REAVLEY and GARWOOD, Circuit Judges.

REAVLEY, Circuit Judge:

Plaintiff, Mrs. Dicie Ellen Hibley Swayze, appeals from a directed verdict granted to defendant, McNeil Laboratories. The plaintiff's son, Michael Wayne Swayze, died three years after surgery from complications caused by an overdose of the narcotic anesthetic fentanyl, a prescription drug produced and marketed by the defendant. During the operation, a nurse anesthetist determined what dosage to administer Michael without receiving proper supervision from an anesthesiologist or the supervising surgeon. The plaintiff brought suit in Mississippi state court against the doctor, the hospital, and the anesthetist. That suit was settled by the payment of a substantial sum to the plaintiff, and she then sued the drug manufacturer by this federal diversity action, claiming product liability and negligence.

According to the testimony the practice of failing to supervise nurse anesthetists during surgery is pervasive in Mississippi, and perhaps many other states. The plaintiff argues that administering anesthetic drugs without prescription by a medical doctor, a violation of Mississippi law, was a practice well known in the anesthesia community and that the defendant should be charged with knowledge of it. The plaintiff urges, therefore, that the jury should have been allowed to determine whether the defendant was liable for distributing fentanyl without warning consumers, or doing more to compel the medical community to properly supervise distribution of its drug. The defendant denies that it had knowledge of the practice, or that it should be charged with that knowledge; and de-

William Liston, Liston, Gibson & Lancaster, Winona, Miss., George E. Gillespie, Jr., Hattiesburg, Miss., for plaintiff-appellant.

fendant insists that it had no duty to warn the general public of the dangers of a prescription drug, and that it did all the law requires it to do to warn medical practitioners of those dangers. Upon completion of the plaintiff's evidence, the district court granted the defendant's motion for a directed verdict. We affirm.

# I

## Facts & Background

On July 13, 1978, Michael Wayne Swayze, the seven-year old son of plaintiff Dicie Ellen Hibley Swayze, sustained an accidental bullet wound to his knee. Dr. Attix removed the bullet at Methodist Hospital in Hattiesburg, Mississippi, where Michael had been transferred following an earlier unsuccessful attempt at Marion County General Hospital. During both surgical procedures Michael received, among other drugs, fentanyl, a narcotic anesthetic, marketed exclusively at this time by defendant McNeil Laboratories under the brand name Sublimaze. At Marion County Hospital, Michael received 4.5 cc's of fentanyl, and at Methodist Hospital a certified registered nurse anesthetist (CRNA), Danny Collier, administered 15 cc's of the drug. Collier testified that he alone determined the dosage of fentanyl Michael received at Methodist Hospital, even though Dr. Attix was present during the administration of the drug. The 15 cc's Collier administered Michael amounted to a severe overdose.

As a result of this overdose, Michael suffered a cardiorespiratory arrest about eight hours after surgery. He was resuscitated, and appeared to do well, until five days later when he suffered a second cardiorespiratory arrest. Although again resuscitated, Michael suffered permanent brain damage from this second arrest. Thereafter, except for several holidays, Michael was confined to a hospital bed. Approximately three years later Michael died.

Fentanyl is an extremely potent anesthetic, estimated to be a hundred times more potent than morphine on a milligram-per milligram basis. It is the most commonly used narcotic analgesic, with the derivative sufentanyl, morphine sulphate, and demerol (or meperidine) comprising the rest of the class of generally used narcotics. Beyond its palliative effect, fentanyl is associated with respiratory depression, a common side-effect of all narcotics. The duration and degree of respiratory depression is directly related to the dose administered. When determining dosage, beside the cumulative effect of the drug on the respiratory system, the age and weight of the patient also must be taken into consideration.

In pharmaceutical parlance, all drugs may be classified generally into two types, "over-the-counter" drugs and "prescription" drugs. Drugs sold over-the-counter are deemed sufficiently safe to be dispensed directly to the public accompanied only by directions for proper use, and relevant warnings printed on the packages. Prescription drugs, on the other hand, due to their potency or unusual characteristics, are dispensed only upon a doctor's order. Prescription drugs carry no warnings to the public on their labels, other than that they may not be distributed without a prescription.

Under Mississippi law, fentanyl is a prescription drug that may be prescribed, administered, and dispensed only under the direction and supervision of a licensed physician. Miss.Code Ann. § 41–29–305 (1972). Under no circumstances may a CRNA prescribe fentanyl in Mississippi.

According to the evidence CRNAs routinely determine dosages during surgical procedures conducted in Mississippi, and perhaps many other states, because there are not enough anesthesiologists to supervise all of the operations being performed. Although the drug is administered in the presence and under the license of the operating physician, the plaintiff's expert testified that in "an overwhelming majority" of operations in Mississippi this procedure is not adequately supervised. The defendant's expert concurred with this conclusion.

Collier testified that he was well advised of the dangers and possible adverse consequences of fentanyl, and had talked to Dr. Attix about the drug on several previous occasions. Indeed, he testified that he had previously administered fentanyl to "thousands" of patients. In addition, he had attended workshops and had read numerous pamphlets and magazines concerning the drug. Dr. Attix, on the other hand, did not testify, but several witnesses testified that he should have been well aware of the potential dangers of the drug.

The defendant relies on essentially three avenues for the dissemination of information about the benefits and dangers of fentanyl. First, the defendant prints extensive warnings and detailed information on packet inserts enclosed in the packages containing the fentanyl.[1] In addition, similar warnings are published in the *Physicians Desk Reference* (PDR),[2] a "dictionary" of drugs routinely relied upon by physicians. Finally, the defendant dispatches "detail men," who are part salesman and part educator, to speak with anesthesiologists and anesthetists about fentanyl.

## II

## Principles of Liability: Strict Liability and Negligence

Although the plaintiff relies alternatively on principles of strict liability and negligence, we agree with the district court that in this case these principles merge into one inquiry: the adequacy of the defendant's warnings. Under principles of strict liability, the defendant's drug is "unreasonably dangerous" if not accompanied by adequate warnings; under negligence principles, the reasonableness of the defendant's conduct in this case also depends on the adequacy of its warning. If the warnings provided health care practitioners, through the PDR, package inserts and detail men, were adequate, then the drug was not unreasonably dangerous, and the defendant's conduct was neither unreasonable nor negligent.[3]

■ The governing rule of strict liability as stated in section 402A of the *Restatement (Second) of Torts* (1965) was adopted in Mississippi in *State Stove Manufacturing Co. v. Hodges*, 189 So.2d 113, 118 (Miss. 1966). Section 402A states that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or con-

---

1. These inserts consist of two full pages of fine print medical information covering a wide array of "warnings," "indications" and "contraindications." Some of the more relevant passages state as follows:

   ACTIONS
   SUBLIMAZE (fentanyl) is a narcotic analgesic with actions qualitatively similar to those of morphine and meperidine.... As the dose of narcotic is increased, the decrease in pulmonary exchange becomes greater. Large doses may produce apnea [i.e., stoppage of breathing].
   ....
   As with longer acting narcotic analgesics, the duration of the respiratory depressant effect of SUBLIMAZE (fentanyl) may be longer than the analgesic effect.
   ....
   WARNINGS
   AS WITH OTHER CNS DEPRESSANTS, PATIENTS WHO HAVE RECEIVED SUBLIMAZE (fentanyl) SHOULD HAVE APPROPRIATE SURVEILLANCE.
   RESUSCITATIVE EQUIPMENT AND A NARCOTIC ANTAGONIST SHOULD BE READILY AVAILABLE TO MANAGE APNEA.

   ....
   ADVERSE REACTIONS
   As with other narcotic analgesics, the most common serious adverse reactions reported to occur with SUBLIMAZE (fentanyl) are respiratory depression, apnea, muscular rigidity, and bradycardia; if these remain untreated, respiratory arrest, circulatory depression or cardiac arrest could occur.

2. The warnings contained in the PDR are virtually identical to those contained in the package inserts.

3. As stated in Comment a to § 402A of the *Restatement (Second) of Torts* (1965), application of the principles of strict liability "does not preclude liability based upon the alternative ground of negligence ... where such negligence can be proved." Here, negligence principles remain fully applicable, but we consider the plaintiff's proof of them along with her strict liability claim since they both raise the same issue.

sumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer." Fentanyl, as the parties agree, is an "unavoidably unsafe" drug. By their very nature, "unavoidably unsafe" drugs present some element of harm. However, such a drug will be deemed unreasonably dangerous *per se*, and its producer held liable, only if the potential harmful effects of the product outweigh the legitimate public interest in its availability. Fentanyl, when administered under proper supervision, is an indispensable weapon in the health care arsenal. Although the present case presents an instance of improper supervision, fentanyl itself is not unreasonably dangerous *per se*. We must then determine whether the drug presents an unreasonable danger as currently marketed.

Comment k to section 402A provides, in pertinent part:

An [unavoidably unsafe product], properly prepared, and accompanied by proper directions and warning, is not defective, nor is it unreasonably dangerous.... The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk.

Therefore, under Comment k, an "unavoidably unsafe" product becomes unreasonably dangerous, thus subjecting its manufacturer to liability, whenever it is not properly prepared, properly marketed, or accompanied by proper warnings. Both parties agree that the fentanyl administered to Michael was not itself tainted, and thus was properly prepared. However, significant dispute exists surrounding the marketing of the drug, in that the plaintiff claims a warning should have been given to consumers, and more should have been done to force physicians to supervise distribution of the drug. The issue of proper marketing then, subsumes that of proper warning; if the defendant owed the plaintiff a duty over and above the warnings provided health care practitioners, fentanyl was "defective" and "unreasonably dangerous" as marketed.

To support her argument, the plaintiff also enlists the aid of the negligence principle announced in section 302 of the *Restatement (Second) of Torts* (1965), which provides as follows:

A negligent act or omission may be one which involves an unreasonable risk of harm to another through ... (b) the foreseeable action of ... a third person....

From this principle, combined with the rule stated in Comment k to section 402A, the plaintiff knits a fabric to clothe the defendant with a duty to warn not only medical practitioners but consumers as well. We have two problems with the plaintiff's position. First, it is the operating room procedure rather than the danger of the drug that the defendant is challenged to add to the warning. And, second, though defendant markets a reasonably safe product when accompanied by a prudent warning of its danger,[4] we are asked to impose upon defendant an additional duty to intrude itself into the hospital operation as well as the doctor-patient relationship. We see no warrant for that position under Mississippi law.

### III

**A Manufacturer's Duty to Warn and Enforce Its Warning**

The usual argument in these cases focuses on the language of the warning, and, in

---

**4.** Comment j to section 402A also is relevant to the duty to warn and provides as follows:

*Directions or warning.* In order to prevent the product from being unreasonably dangerous, the seller may be required to give directions or warning, on the container, as to its use.

....

Where warning is given, the seller may reasonably assume that it will be read and heeded; and a product bearing such a warning, which is safe for use if it is followed, is not in defective condition, nor is it unreasonably dangerous.

particular, whether the physician was provided sufficient information to understand the dangers of the drug. *See Mauldin v. Upjohn Co.*, 697 F.2d 644 (5th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983); *Timm v. Upjohn Co.*, 624 F.2d 536 (5th Cir.1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981). If the language of the warning is adequate then the drug manufacturer ordinarily is freed from liability. *See, e.g., Timm*, 624 F.2d at 538 ("[P]laintiffs conceded in oral argument that, if the warning was adequate, the action would more properly lie against the prescribing physician"). But here, both parties agree that the *language* of the warnings, printed in the package inserts and published in the PDR, was adequate. The plaintiff contends, however, that because CRNAs administer fentanyl without proper supervision, and the defendant knew or should have known this fact, it must do more than just warn health care practitioners. The district court erred, according to the plaintiff, in not allowing the jury to determine the defendant's liability for marketing fentanyl in light of all of the

circumstances and consequences of its distribution.

While we see no material factual issues here, and though we conclude that the Mississippi law imposes no duty upon a drug manufacturer beyond that discharged by the defendant, we will discuss fully the contention of the plaintiff.

In its brief, the plaintiff lists eight courses of action that the defendant could have taken to ensure that its drug was distributed correctly, and, presumably, avoid liability. The plaintiff's eight suggestions may roughly be divided into three categories: first, providing warnings to consumers; second, pressuring the medical community to heed the warnings provided to it; and third, removing fentanyl from the market.[5] We consider these three alternatives in turn.

### a. Duty to Warn Consumers

The plaintiff places great reliance on this court's decision in *Reyes v. Wyeth Laboratories*, 498 F.2d 1264 (5th Cir.), *cert denied,*

---

5. In regard to warning consumers, the plaintiff suggests,
   1. McNeil could warn the general public that this [operating room] practice was occurring and increase public awareness of the increased risk inherent in this unlawful and dangerous practice.
   2. McNeil could warn the consumer of the increased risk.
   The second of these suggestions we consider at some length in the next section; the first one we find no support for in law or reason. Surely the defendant cannot be required to take out newspaper and television advertisements alerting Mississippians to the negligent practices of Mississippi physicians.
   Arguing that the defendant could pressure the medical community into properly supervising CRNAs, the plaintiff suggests,
   3. McNeil could bring the problem to the attention of the proper authorities, including administrative and law enforcement agencies, who are empowered to enforce compliance with state laws applicable to ethical drugs and other controlled substances.
   4. McNeil could start back down the chain of culpability and insist that the hospitals in which its drugs are sold take steps to bring their practices into conformity with state law.

   5. McNeil could send its detail men to call on surgeons to bring the risk of this practice to the attention of the physicians.
   6. McNeil could use direct mailings to physicians, nurse anesthetists and hospital or trade journal advertising to focus attention on the danger inherent in this practice.
   7. McNeil could restrict the sale of Sublimaze to hospitals which establish and enforce appropriate procedures to assure that Sublimaze is prescribed and administered in compliance with state law.
   If this practice is as commonplace as the plaintiff argues, suggestions five and six are not likely to help, since all of the parties listed in these two either know of, or are guilty of, the practice. The third suggestion requires the defendant to interpret Mississippi law, although it is possible for defendant to do so. Conceivably, a drug manufacturer could undertake four and seven. However, liability is imposed only for a defendant's failure to act reasonably, not for failing to do all that could be done.
   The plaintiff's last suggestion, that if all else fails the drug should be removed from the market, is considered in the final section of this opinion.

419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974), where we found a drug manufacturer liable for failing to warn consumers of the dangers inherent in receiving its prescription drug—an oral polio vaccine. The *Reyes'* plaintiff contracted polio after receiving the vaccine from a registered nurse during a mass inoculation program at a health clinic where no physicians were present. However, *Reyes* is an exception to the general rule that where prescription drugs are concerned, a manufacturer's duty to warn only extends to physicians and not to laymen. We explained as follows:

> We cannot quarrel with the general proposition that where *prescription* drugs are concerned, the manufacturer's duty to warn is limited to an obligation to advise the prescribing physician of any potential dangers that may result from the drug's use.... As a medical expert, the prescribing physician can take into account the propensities of the drug, as well as the susceptibilities of his patient.... The choice he makes is an informed one, an individualized medical judgment bottomed on a knowledge of both patient and palliative. Pharmaceutical companies then, who must warn ultimate purchasers of dangers inherent in patent drugs sold over the counter, in selling prescription drugs are required to warn only the prescribing physician, who acts as a "learned intermediary" between manufacturer and consumer.

498 F.2d at 1276 (emphasis in original). This rule has been reaffirmed in *Timm v. Upjohn Co.*, 624 F.2d 536, 538 (5th Cir. 1980), *cert. denied*, 449 U.S. 1112, 101 S.Ct. 921, 66 L.Ed.2d 840 (1981), and *Mauldin v. Upjohn Co.*, 697 F.2d 644, 647 (5th Cir.), *cert. denied*, 464 U.S. 848, 104 S.Ct. 155, 78 L.Ed.2d 143 (1983).

But, as in *Reyes*, when a physician is not present to weigh the risks and benefits for the consumer, the basis for the prescription drug rule disappears. *See also Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121, 131 (9th Cir.1968) (drug manufacturer held liable for marketing prescription drug without a warning to consumers, because it knew drug was to be dispensed "without an individualized balancing by a physician of the risks involved"). In such cases, a drug manufacturer must provide consumers with enough information to allow them to make an educated decision.

The plaintiff maintains that, in fact, Michael's physician did not act as a "learned intermediary" as required by law, and that this failure was part of a pervasive practice in Mississippi of which the defendant was, or should have been, aware. Indeed, in *Reyes* we held a drug manufacturer to the skill of an expert in the field, which includes "knowledge common in the drug industry as to distribution and administration of pharmaceutical products." 498 F.2d at 1277. No matter what specific duty Michael's doctor owed him, the plaintiff argues, the medical profession's general failure to oversee the distribution of fentanyl makes it incumbent upon the defendant to provide warnings to consumers.

The facts in the present case differ significantly from those in *Reyes*, however. In *Reyes*, an expert testified that "a great majority" of vaccinees received their vaccine in mass administrations and in "assembly line" fashion. 498 F.2d at 1277. Additionally, the expert testified that there rarely was sufficient time or personnel to make "an individualized medical judgment" of the vaccinee's needs or susceptibilities. *Id.* In contrast, a physician, Dr. Attix, was present at all times during the administration of the drug in this case. As Michael's surgeon, Dr. Attix assumed the role of "learned intermediary" to judge what treatment his patient should receive. Thousands of decisions must be made while a patient lies unconscious on the operating table, most of which must be made based on the exigencies of the moment. Indeed, in *Reyes*, the plaintiff had had to choose between the risk of getting polio if not vaccinated and the risks of the vaccination itself. Such a categorical determination did not exist here. The tragic error was not the decision to receive fentanyl, it was the excessive dose inflicted on this little boy. This was the determination Michael's

mother entrusted with the doctor, and no one else but a doctor could have made it.

The plaintiff directs our attention to *Gordon v. Niagara Machine & Tool Works*, 574 F.2d 1182 (5th Cir.1978), where we affirmed the district court's imposition of liability on a manufacturer of a punch power press for failing to warn the actual users of the machine. Niagara, the manufacturer of the power press, had warned the plaintiff's employer of the dangers of the machine, but had not affixed a warning label to the machine or, in any other way, warned Niagara's employees. The district court held that the manufacturer's duty extended past the employer to the users of the machine, and that it could not rely on the employer's intervening negligence to escape from liability. 574 F.2d at 1192.

However, once again we must look at the facts, for the reasonableness of the defendant's conduct depends on the situation it confronted. In *Niagara*, a warning attached to the machine would have alerted the person operating the machine of the relevant dangers. We must query what form a similar warning should take in this case. At oral argument, plaintiff's counsel suggested the use of posters or consent forms to alert patients that they might receive anesthesia during their operation in an unsupervised fashion. But what would patients do with this information? It might prompt would-be patients to put pressure on their physicians to better supervise, but physicians hardly need more incentive to be non-negligent. In all likelihood, such warnings would only lead to confusion, and perhaps undermine the physician-patient relationship.

■ When the physician-patient relationship does exist, as here, we hesitate to encourage, much less require, a drug manufacturer to intervene in it. In *Reyes*, the consumer received a one-time inoculation of polio vaccine in a mass administration. Here, even though Michael was brought to Methodist Hospital on an emergency basis, Dr. Attix took responsibility for his care, both during the operation and for some time afterwards. A special relationship, between physician and patient, thus formed; this relationship receives special protection in law, and, at the same time, creates a great responsibility for every physician. In this case, this relationship encompassed much more than the dosage of anesthetic Michael would receive. Although in retrospect this decision, or failure of decision, dwarfed all others, it was an integral part of Dr. Attix's responsibility to Michael. He assumed the role of "learned intermediary," and the burdens thereof. The facts of this case may reveal a practice in Mississippi of physicians allowing CRNAs too much discretion in a role they are not trained to play; but it is the physicians who have undertaken the responsibility of supervising CRNAs, and that responsibility cannot be shunted onto, or shared with, drug manufacturers.

**b. A Manufacturer's Duty to Enforce Its Warnings**

■ The plaintiff also argues that the defendant should have done more to force physicians and hospitals to heed its warnings. As the plaintiff points out, the pertinent danger was not simply the adverse side-effects of the drug; it was the unsupervised administration of the drug. But as the trial court observed, this practice does not occur in every operating room in Mississippi. The practice appears to be a variable one that depends on the particular diligence of the supervising physician and the resources of the hospital. Many physicians duly supervise the CRNA's activities, and larger or wealthier hospitals hire anesthesiologists to perform this function. It is both impractical and unrealistic to expect drug manufacturers to police individual operating rooms to determine which doctors adequately supervise their surgical teams.

**c. Removing Fentanyl from the Market**

■ Finally, the plaintiff suggests that if the defendant does not, or cannot, change the existing practice by which fentanyl is administered, it should remove its drug from the market. But fentanyl is not

the only narcotic analgesic generally used, nor is the defendant the only producer of such products. The problem here lies with individual physicians, in certain operating rooms in Mississippi, who are not supervising the administration of this very potent drug, and many others like it. The defendant cannot control the individual practices of the medical community, even if it is the prevailing practice, and we decline to impose such a duty. Drug manufacturers must adequately warn physicians of the potential side-effects of their prescription drugs; thereafter, the physician, with his special knowledge of the patient's needs, assumes the burden of presiding over the patient's best interests.

AFFIRMED.

GOLDBERG, Circuit Judge, dissenting:

I respectfully dissent. My brethren view too narrowly the scope of the duty imposed on McNeil to provide "adequate warnings" with inherently unsafe prescription drugs. Settled law holds McNeil liable for the harm the drugs actually and proximately cause if no "learned intermediary" intervenes or if McNeil knows that the drugs will be utilized in a widespread practice of illegal and dangerous medical activity. McNeil cannot immunize itself from liability simply by providing "adequately" written warnings that as a practical matter will not effect prophylaxis. Rather, such drugs with accompanying but inadequate warnings are defective products unreasonably dangerous to the public. *See* Restatement (Second) of Torts, Section 402A (1965); *State Stove Mfg. Co. v. Hodges*, 189 So.2d 113, 118 (Miss.1966), *cert. denied sub nom. Yates v. Hodges*, 386 U.S. 912, 87 S.Ct. 860, 17 L.Ed.2d 784 (1967) (incorporating Restatement § 402A into Mississippi law); *Gordon v. Niagara Machine & Tool Works*, 574 F.2d 1182, 1186–95 (5th Cir. 1978) (under Mississippi law, intervening negligence does not insulate a manufacturer from liability for failure to warn ultimate users whom it has reason to know will not receive warnings); *cf. Incollingo v. Ewing*, 444 Pa. 263, 444 Pa. 299, 282 A.2d 206, 215 (1971) (interpreting inadequate warnings under Restatement § 402A; "[o]n th[e] basis [of evidence] the trial court instructed the jury that if it found that Parke, Davis was on notice that the drug was being used indiscriminately, and yet failed to try to restrict its use to proper situations, then the company could be found negligent. We think the charge was proper. When a required warning is retained unchanged in the face of being widely disregarded, and the supplier knows or has reason to know of such wide disregard, a jury may be permitted to find the warning insufficient."); *Salmon v. Parke, Davis & Co.*, 520 F.2d 1359, 1362 (4th Cir. 1975) ("when a manufacturer does not change a warning it knows is widely disregarded, a jury may infer that the warning is insufficient.") (citing *Incollingo*).

## I.

At trial, Swayze introduced the expert testimony of two eminent anesthesiologists, familiar with Mississippi medical practices in 1978, and the testimony of the nurse who administered the anesthetic to Michael Swayze. This testimony was more than sufficient to establish that McNeil knew or should have known—had actual or constructive knowledge—of the widespread and common practice in many Mississippi hospitals that nurses not only were administering fentanyl improperly, but also illegally were choosing the anesthetic, determining the dosage, and administering the drug. Attending surgeons totally failed to provide any supervision regarding anesthesia, and no anesthesiologists were present. *See* Appendix 1. These facts are abundantly sufficient to convince a reasonable juror that McNeil knew, or should have known, that fentanyl would be prescribed without active or passive supervision by any doctor. Thus, the majority's and trial court's observations that doctors acted to direct or to supervise nurse anesthetists and that McNeil could not know the level of supervision, majority at 471; Rec. Vol. 2, District

Court Opinion, at 14, directly contradict the clear record at trial.[1]

It is undisputed that such activity violates Mississippi law and sound medical practice, regardless of the training of the C.R.N.A.s. The nurse here and nurses in many Mississippi hospitals not only administered narcotic, but more importantly chose, prescribed, and monitored the anesthesia solely on their own. The choice of anesthetic agent and of dosage, and the actual administration of anesthetic were all proximate medical causes of the harm. *See* Appendix 2.

## II.

The case law makes clear, and the majority concedes, that a duty to warn consumers attaches if no physician adopts the role of "learned intermediary" in prescribing the medicine. *See Reyes v. Wyeth Laboratories,* 498 F.2d 1264 (5th Cir.1974), *cert. denied,* 419 U.S. 1096, 95 S.Ct. 687, 42 L.Ed.2d 688 (1974); *Givens v. Lederle,* 556 F.2d 1341 (5th Cir.1977); *Davis v. Wyeth Laboratories, Inc.,* 399 F.2d 121 (9th Cir. 1968). Despite the majority's reasoning, the mere physical presence of a physician in an operating room does not in any way distinguish *Reyes, Givens,* or *Davis.* The failure of a doctor to exercise his fiduciary duty to supervise care and to prevent unqualified persons (legally and by training) from prescribing fentanyl cannot be consistent with performing a "learned intermediary" role. *See Brazzell v. United States,* 788 F.2d 1352, 1358 (8th Cir.1986) (on rehearing) (doctor assumed the role of distributor, rather than learned intermediary, invoking manufacturer's duty to warn ultimate consumer); *Reyes,* 498 F.2d at 1277 (drug administered "without the sort of individualized medical balancing of the risks to the vaccinee that is contemplated by the prescription drug exception."); *Givens,* 556 F.2d at 1345; *Williams v. Lederle Laboratories,* 591 F.Supp. 381, 389 (S.D. Ohio 1984) ("The appropriate test ... is whether the drug is commonly administered without individualized balancing...."). *But see Stanback v. Parke, Davis & Co.,* 657 F.2d 642, 647 (4th Cir. 1981).

An operating room can become the legal equivalent of a flu clinic when treated as such *by doctors.* The majority thus errs in implying that the doctors who supervised or performed surgery also supervised or performed anesthesia. Majority at 468. It is common knowledge that doctors and medicine have become highly specialized and compartmentalized; surgeons are not licensed as anesthesiologists. McNeil's detail men provided information to nurses because surgeons played no role in anesthesia. The nurses illegally and solely chose, prescribed, and administered anesthesia as much as if a doctor never entered the room. Denial of liability because of a surgeon's mere physical presence exalts form over substance and artificially defers to professionalism that does not exist in this case.

## III.

I also disagree with the majority's implication that subjecting McNeil to a broader scope of duty would in any way infringe or intrude upon doctor-patient relationships. Majority at 471; *see Pharmaceutical Mfrs. Ass'n v. Food & Drug Admin.,* 484 F.Supp. 1179, 1186–88 (D.Del.1980) (upholding F.D.A. regulation requiring doctors and pharmacists to provide package warning inserts to patients receiving estrogen and rejecting that the regulation would intrude upon the "physician's right to exercise professional judgment"). The facts here establish that many surgeons are in total breach of their duty of supervision and care in regard to anesthesia. *See Hall v. Hilbun,* 466 So.2d 856 (Miss.1985) (Mississippi standard of medical care); *Pharr v. Anderson,* 436 So.2d 1357, 1361 (Miss.1983) (negligent failure to treat). Because these surgeons rely entirely upon the C.R.N.A.s, no meaningful or real doctor-patient relationship exists in

---

**1.** *Cf.* Talking Heads, *Psycho Killer,* Stop Making Sense (movie or record version 1985) ("Can't seem to face up to the facts.").

regard to anesthesia. Thus, McNeil could not infringe upon these surgeons' relationship to the patients, because the doctors themselves have confined the relationship to surgical matters. *See Carlsen v. Javurek*, 526 F.2d 202, 206–07 (8th Cir.1975) (mere presence of one of two doctors at surgery, even when that doctor shrugged his shoulders in response to nurse's decision to administer anesthesia, which nurse interpreted as partial approval, was insufficient to create participatory role in anesthesia which would permit negligence claim against the doctor for breach of duty).

Even were a meaningful doctor-patient relationship to exist, as the majority intones, intrusion on such a relationship is not a valid or recognized legal principle for shielding doctors from liability. On the contrary, the law constantly intrudes on medical relations through the law of malpractice, forcing changes in medical care provision, insuring compliance with legal and medical duties, and subjecting doctors to liability for their inadequate relations with patients. Similarly, manufacturers constantly alter medical standards of care both through generation of new technologies and through marketing and market mechanisms. In such a context, the intervention of a responsible party to force compliance with the law and to protect an unwitting and vulnerable public from the doctors who are supposed to but do not provide adequate care is not merely acceptable, but absolutely necessary.

The failure of nurses, doctors, hospitals, and Mississippi authorities to insure a meaningful doctor-patient relationship does not and should not inure to the benefit of McNeil. The majority and trial court (implicitly), however, find that the manufacturer has no duty to pressure the medical community to properly supervise C.R.N.A.s. Majority at 471; Rec. Vol. 2, District Court Opinion, at 13. I believe, however, that both law and morality require McNeil to monitor and ensure that the products it manufactures and markets are not generally used in an unreasonably dangerous fashion. If this entails some pressure to avoid deaths that McNeil can prevent, McNeil is

required to do no less. *See Jackson v. Johns-Manville Sales Corp.*, 727 F.2d 506, 515 (5th Cir.1984), *aff'd on rehearing and reinstated in part*, 750 F.2d 1314 (5th Cir. 1985) (en banc), *questions certified to Mississippi Supreme Court*, 757 F.2d 614 (5th Cir.1985) (en banc), *certificate for questions dismissed*, 469 So.2d 99 (Miss.1985) (en banc), *aff'd on certified issues*, 781 F.2d 394 (5th Cir.1986) (en banc), *cert. denied*, —— U.S. ——, 106 S.Ct. 3339, 92 L.Ed.2d 743 (1986). McNeil cannot simply disclaim any duty when reasonable alternative actions exist. At the very least, the jury should have had the opportunity to pass upon the reasonableness of the manufacturer's activities.

The plaintiff has suggested numerous actions that McNeil *reasonably* could have taken to avoid the risks. Thus, the failure to provide adequate warnings or to take any action to change the circumstances constitutes sufficient evidence from which a reasonable juror could infer that McNeil's manufacture and marketing of the drug were the proximate cause of Michael Swayze's injuries, and that the doctor, nurse, and/or hospital were not the sole proximate cause as found by the trial court. Rec. Vol. 2, District Court Opinion, at 15; *see Jackson*, 727 F.2d at 523 (citing *New Orleans & N.E.R. Co. v. Burge*, 2 So.2d 825, 826 (Miss.1941)); *Van Buskirk v. Carey Canadian Mines, Ltd.*, 760 F.2d 481, 493 (3rd Cir.1985).

## IV.

The general law of products liability from which the learned intermediary law of prescription drugs derives also requires reversal. The unreasonably dangerous determination can be made in myriad ways; Mississippi adopted a "flexible" standard for the jury to determine "unreasonableness" in *Hamilton Fixture Co. v. Anderson*, 285 So.2d 744 (Miss.1973). *See generally* J. Beasley, *Products Liability and the Unreasonably Dangerous Requirement* (1981). It is settled, moreover, that no warning can be considered adequate if the

warning foreseeably will not be communicated, and thus cannot prevent the concomitant harm. As Judge Wisdom succinctly stated in *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076, 1091, 1092 & n. 29 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) (emphasis in original):

> We agree with the Restatement: a seller may be liable to the *ultimate* consumer or user for the failure to give adequate warnings. The seller's warning must be reasonably calculated to reach such persons and the presence of an intermediary party will not by itself relieve the seller of this duty. Sterling Drug Co. v. Cornish, 8 Cir.1966, 370 F.2d 82; Yarrow v. Sterling Drug, 8 Cir.1969, 408 F.2d 978; Noel, Products Defective Because of Inadequate Warnings, 23 S.W.L.J. 256 (1969).... Where a product is extremely dangerous, however, the seller or manufacturer cannot rely upon the intermediate party to transmit a warning. *See* Prosser, [The Fall of the Citadel, (Strict Liability to the Consumer), 50 Minn.L. Rev. 791, 826–828 (1966) ]....

We need not decide today whether fentanyl, an "inherently unsafe" product, is "extremely dangerous" or presents an "unreasonable" risk, because the relevant circumstances reveal that McNeil's reliance on an imaginary intermediary was inadequate to provide warning.[2]

In this context, the reasoning of the district court is plainly in error. The district court

recognize[d] the argument of the Plaintiff that detail men were another method of warning or disseminating information about Fentanyl, and it is stipulated that they visited only with the anesthesiologists and the anesthetists. However, it's not McNeil's fault that the surgeons are not fulfilling all of their obligations.

If McNeil had taken no actions to educate the anesthetists along with the anethesiologists about this drug, having knowledge that the supervision by surgeons was not what it should have been, we may have an allegation of failure to adequately get the warning to the person who actually needed it, that is [to] the person who would be in the best position to weigh the benefits against the risks, the anesthetists.

But McNeil did both here, in this Court's opinion. They made this package insert available; they made it accessible. The P.D.R. was available; it was accessible. And this court does not find that this case falls within the rule of *Gordon v. Niag[a]ra Machine & Tool Works,* 506 F.2d 419 (5th Cir.1974), *after remand,* 574 F.2d 1182 (5th Cir.1978), *reh. denied,* 578 F.2d 871 (1978), that they knew on all occasions that the physicians were not knowledgeable of the dangers of this particular drug and knew that they were not fully exercising their supervision.

You cannot generalize in this area. Dr. Attix ... had worked with Mr. Collier for a number of years. Collier had been trained at Mayo Clinic; he had ad-

---

**2.** *Williams,* 591 F.Supp. at 389, implies that McNeil can be held liable regardless of whether McNeil actually or constructively knew of the absence of learned intermediary intervention, if the illegal administration is a common practice. *Williams* (implicitly) and other cases (explicitly) abandon the old view that negligent warning and defective warning pose the same inquiry. Contrary to the majority's and district court's assertions, majority at 467 n. 3; Rec. Vol. 2, District Court Opinion, at 9, foreseeability concepts derived from negligence may be inapposite to strict liability warning claims, because the underlying rationale of strict liability focuses on the product, not on conduct, in relation to the circumstances. *See Jackson,* 727 F.2d at 512

(criticizing incorporation of negligence concepts of duty into strict liability); *Hamilton,* 285 So.2d at 747–48; *cf. Bridges v. Chemrex Specialty Coatings, Inc.,* 704 F.2d 175 (5th Cir.1983). *But see Walton v. Chrysler Motor Corp.,* 229 So.2d 568, 573 (Miss.1969), *overruled, Toliver v. General Motors Corp.,* 482 So.2d 213 (Miss.1985) (en banc). *See generally* J. Beasley, *Products Liability and the Unreasonably Dangerous Requirement* 421–43 (1981) ("Failure to Provide Adequate Warnings") (discussion citing cases). The majority should not decide that negligent and defective warning are equivalent issues under Mississippi law or otherwise; under either view, the facts are sufficient to hold McNeil liable.

ministered this drug thousands of times; and there had never been any serious consequences or results from the use of this drug during surgical procedures. Rec. Vol. 2, District Court Opinion, at 12–13.

First, the testimony established a generalized pattern and commonly known practice in many hospitals that surgeons, the only doctors present, routinely did not supervise anesthesia. If the pattern and practice of illegal and incompetent prescription were known, the harm was foreseeable. Further, *Niagara* does not stand for the proposition cited; *Niagara* only holds that foreseeable intervening negligence does not shield manufacturers from liability. Thus, if the manner of harm were foreseeable, it does not matter whether McNeil knew specifically of Dr. Attix and Mr. Collier, or of "all occasions."

Second, it is precisely because C.R.N.A.s are not qualified to prescribe, regardless of their training or the level of their understanding, that no warnings to the *nurses* can be considered adequate. It was undisputed at trial that C.R.N.A.s are not in any position to assess the "consequences" to the patients from the dangers of the drug. They are legally and technically unqualified to weigh the benefits against the risks, regardless of whether they fully understand the risks of respiratory complication from fentanyl. Mississippi law and the undisputed medical testimony currently require that the choice of an anesthetic agent and the prescription of an appropriate dosage be performed by a medical doctor. Hence, educating nurses about the risks cannot remedy any failure to provide adequate warnings to the doctors. *Cf.* Restatement (Second) of Torts, § 390 (1965).

Third, the only warning given to the surgeons, often the only doctors present, was through publication in the Physician's Desk Reference (P.D.R.). The parties stipulated that sales were made only to anesthetists and anesthesiologists, and testimony established that surgeons likely did not see the warnings accompanying the drug itself. A reasonable juror could conclude that P.D.R.

warnings were insufficient. But here it does not matter whether the surgeons ever received or understood the P.D.R. warnings, because McNeil arguably knew that surgeons routinely did not supervise prescription. If surgeons did not supervise prescription, warnings to them could not be passed on to the patient or to anyone who could use the warning; if surgeons would not play *any* role in anesthesia, no warning to them could ever have any effect.

Thus, the majority improperly relies upon the presumption of Comment j to Section 402A of the Restatement, that McNeil's warnings would be heeded. *Cf.* Restatement (Second) of Torts, § 388, Comment g (1965) (presumption of proper use "[s]ave in exceptional circumstances, as where ... the person to whom it is supplied is obviously likely to misuse it"); *Doss v. Apache Powder Co.,* 430 F.2d 1317, 1321 (5th Cir.1970) (applying Restatement § 388). We have recently reiterated that the duty to warn can be satisfied through intermediaries only " 'by proving that [the] intermediary was ... capable of passing on a warning.' ... [The] warning was thus evaluated solely on the basis of whether or not it would reach the ultimate consumer; there was no mention of the adequacy of [the] warnings to or training of [the intermediary]." *Leonard v. Aluminum Co. of America,* 800 F.2d 523 (5th Cir.1986) (quoting *Alm v. Aluminum Co. of America,* 717 S.W.2d 588 (Tex.1986)). If the intermediary makes clear from his actions that he effectively will not pass on or will not use the warning, the manufacturer cannot rely upon him to do so. *See* Restatement (Second) of Torts, § 389, Comment f (1965) ("Again, if the seller has reason to anticipate the possibility that the warning which he conveys to an intermediate dealer will not reach the ultimate user ... the seller is not relieved of liability when the user does not receive the warning.").

## V.

It is also subject to question whether a warning *to patients* could be fully "adequate." Surgery patients may not be able

to evaluate or to consent to an illegal and dangerous manner of prescribing and administering anesthesia, as the majority recognizes, majority at 471. Even a warning explicitly stating that, at risk of death, patients should not consent to any administration of fentanyl under these conditions might not be adequately comprehensible. Patients may have no means of evaluating the likelihood of danger from illegal prescription nor of weighing the danger against the benefits; this is precisely why a learned intermediary is required for prescription drugs. *See Canterbury v. Spence,* 464 F.2d 772, 780 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972) ("The average patient has little or no understanding of the medical arts, and ordinarily has only his physician to whom he can look for enlightenment with which to reach an intelligent decision."). Similarly, patients may be unlikely to believe that doctors would willingly subject them to such risks, and thus foreseeably would not heed the warnings. *Cf. Brazzell,* 788 F.2d at 1359 (listing three factors for the validity of presumptions relating to causation: warnings to the public without the advice of a doctor would not be helpful; public policy favors placing the risks of loss on manufacturers not consumers; and the publicity surrounding the "swine flu program minimized the impact of any warning."); *Salmon,* 520 F.2d at 1363 (overpromotion nullifies effect of valid warnings). But to say that no warning could be adequate requires neither absolution from liability, nor prohibition of the product. This case does not raise a regulatory question, appropriate for the legislature or administrative agencies, but rather the judicial question of who should bear the costs of avoidable risks.

McNeil in this case chose to supply the drug without further effort. If McNeil had preferred not to run the foreseeable risk of liability, McNeil could have changed the circumstances under which it provided the drug. I thus feel compelled to disagree with the district court's determination that to remove a socially useful anesthetic from the market is "preposterous" or that we would have to revert to "the old ether" or "a shot of whiskey." Rec. Vol. 2, District Court Opinion, at 14. As the plaintiff suggested, McNeil could have prevented liability by removing, selectively, the drug from hospitals that could not ensure that qualified doctors would prescribe.

McNeil would not have had to police the operating room by engaging in selective withdrawal or by conducting other activities suggested by the plaintiff. Enforcing compliance would have remained the task of the hospitals, doctors, and Mississippi authorities. McNeil's only task would have been to obtain adequate assurances of compliance on which it could reasonably rely. Moreover, competitive or media pressures resulting from selective withdrawal would likely have forced hospitals themselves to abandon the illegal practice and to insist that anesthesiologists were hired or that surgeons were required meaningfully to supervise anesthesia. At that point, McNeil might have boosted its market share through the beneficial publicity of responsible action. The precedent of temporarily and entirely removing Tylenol (after some lots were laced with cyanide) from the market is one example of how effective withdrawal and restoration can be to prevent harm and to maintain or boost market share.

Finally, I do not believe that holding McNeil accountable for the foreseeable harm would be "preposterous" even were fentanyl the only anesthetic, were McNeil the sole provider of fentanyl, and were McNeil required (to avoid liability) to remove all fentanyl from the market. In that event, Restatement § 402A requires a *careful* balancing of the social benefits and risks, with equal regard for the successes and the failures of modern medicine in the particular circumstances, to determine whether the particular product's risks are "reasonable." *See Reyes,* 498 F.2d at 1274. The conclusion is *not* foregone, as the district court would imply; the health benefits from surgery—both necessary and elective, and with regard to life expectancy and quality of life valuations—would have to be

weighed against the empirical likelihood of respiratory failure and death under the circumstances.

If liability were found, McNeil could still provide a useful anesthetic, and spread the risk of loss through its pricing mechanisms. This would comport with public policy and settled tort law, and would equitably and efficiently expand the segment of the public that shoulders the costs of permissible, regulated risks, from those who are directly harmed to purchasers (including those harmed), shareholders, and the insurance industry's customers. *See generally* G. Calabresi, *The Costs of Accidents: A Legal and Economic Analysis* (1970); Abraham, *Cost Internalization, Insurance, and Toxic Tort Compensation Funds*, 2 Va.J.Nat.Res.L. 123 (1982).

## Conclusion

The majority would permit the problem of illegal prescription of anesthesia by C.R.N.A.s to rest solely with the individual physician, who "assumes the burden of presiding over the patient's best interests." Majority at 472. As stated above, this is a situation where no doctor presides over the patients' interests. The majority's incantation of the talismanic phrase "learned intermediary" cannot transfigure the reality of this tragedy.

Moreover, this is not merely a doctor's problem, but a social problem; doctors, nurses, and hospitals are clearly at fault and state authorities are not enforcing compliance with law. In such a case, McNeil cannot simply continue to sell its product, knowingly provide an ineffective warning, and let the public confront substantial, illegal, and potentially unreasonable risks.

Like others, drug companies must bear the burden of compensating the avoidable harms that they have caused; like others, drug companies will still be praised for the social benefits that they convey. We must always permit two questions to be asked and meaningfully analyzed: Whether the benefits in fact exceed the harms, and whether the harms can be avoided. Here, McNeil reasonably could have avoided the harms. I thus believe that both the law and common sense require the directed verdict to be reversed and the case remanded for a new trial.

## APPENDIX I

Danny Collier, the C.R.N.A. who prescribed fentanyl for Michael Swayze, testified as follows:

Q. Isn't it a fair statement that Dr. Edward Attix [(the surgeon in the Swayze operation)] usually relied upon you, the C.R.N.A. that was working with him, to handle all aspects of anesthesia for a particular case?

A. On most cases yes.

. . . .

Q. Is it fair to say that you worked with most surgeons in the Hattiesburg area there at the hospital?

A. Correct.

Q. Is it also a fair statement to make that the other surgeons did not get actively involved with anesthesia questions in the surgeries in which you and the other surgeons worked with?

A. Yes.

Q. So, basically, the other surgeons left all questions of anesthesia up to you, Danny Collier, is that correct?

A. Yes.

. . . .

Q. In your seven years while you were practicing your trade of C.R.N.A. in Hattiesburg, do you ever have a recollection of having pulled a package insert such as Exhibit A [the fentanyl warning] from the box [of anesthetic ampules mailed directly to nurse Collier, not to surgeons, which nurse Collier would bring into the operating room from the hospital pharmacy at his own initiative] and discussing it with a surgeon?

A. Not to my recollection.

APPENDIX I—Continued

. . . .

Q. I understand you kept [the box with the warning] in the drawer of the cart so it was available in the operating theater, but would the surgeon as a matter of course ever come across Exhibit A in a standard operation?

A. Not to my knowledge.

. . . .

Q. Did you perform an induction on Michael Swayze?

A. Yes, I did.

Q. When and how did you do that?

A. When Dr. Attix was in the theater and was ready to go, he told me he was ready to start. That's when I performed the induction.

Q. How did you do the induction?

A. I did a crash induction.

Q. Who made the determination to utilize a crash induction?

A. I did.

Q. Did Dr. Attix make that decision?

A. No.

Q. Did you and Dr. Attix have any discussion of Sublimaze before making that induction?

A. No.

. . . .

Q. Now, did Dr. Attix instruct you when to administer [incrementally] another cc. of Sublimaze?

A. No.

Q. Was it entirely in your judgment when to administer and if you needed to administer another cc. of Sublimaze?

A. Yes.

Q. Is that true for the entire 15 cc. of Sublimaze that you administered?

A. Yes.

Q. Did Dr. Attix have any discussion with you during the surgical procedure about your anesthesia method or the drug you used or the amount?

A. No.

Q. Did Dr. Attix know what you were administering and in what increments and amounts you were administering during the surgical procedure?

A. Not to my knowledge.

Q. In other words, you didn't call it out to him, Doctor, I'm fixing to do X, Y, Z?

A. That's correct.

Q. Now, following the surgery or close to the end of surgery, you administered to Michael Swayze 1 cc. of Narcan [an antagonist to fentanyl to combat respiratory depression], is that correct?

A. Correct.

Q. And that's all of the Narcan that Mr. Swayze received that day?

A. As far as I know.

Q. Whose decision was it to administer 1 cc. of Narcan?

A. It was my decision.

Q. Did you exercise the judgment that Michael Swayze needed that 1 cc. of Narcan?

A. Yes.

Q. Did Dr. Attix have any discussion with you about that administration of 1 cc. of Narcan?

A. No.

Q. Did you ever inform Dr. Attix either before or after you administered that 1 cc. of Narcan as to what you did?

A. No.

Q. To your knowledge, did Dr. Attix know that the man ever received any Narcan during the surgical procedure and immediately thereafter?

A. Not that I know of.

. . . .

Q. The interchange between you and Dr. Attix prior to surgery, during surgery, and immediately after the surgery of Michael Swayze, was it similar to the interchange between you and Dr. Attix and other surgeons during surgery in other surgeries?

A. Yes.

APPENDIX I—Continued
. . . .

Q. But to your knowledge, [Dr. Attix] didn't know what you were using, when, or how much you were using at that particular time, is that correct?

A. Not to my knowledge.

Q. Is that last statement that I made and you affirmatively answered true of most surgeries that you performed at Methodist Hospital, that the physician would not actively direct you by verbal comments to you and that the physician would be unfamiliar during the time he was performing the surgery of what you were using, when you were using it, and how much? Is that true?

A. Well, the surgeon has confidence in me to do the anesthesia; and the surgeon at that particular time has his hands full with the operation. To take time out to discuss the particulars would take him away from his surgery, what he is there for.

Q. My statement is generally true?

A. Yes.

Q. Is it fair to say that a large number of hospitals in Mississippi of the approximate size of Methodist Hospital utilized C.R.N.A.'s in the same manner that Methodist Hospital utilized your services for the seven years that you were there?

A. To my knowledge, yes.

Rec. Vol. 3, at 95, 97–100, 106–10, 113–14. Dr. James Arens testified similarly as to the pattern and practice:

Q. And in these particular hospitals that we've been talking about, there were CRNA's there that were practicing their trade of anesthesiology [ (sic) ] on a day-to-day basis without the supervision of an anesthesiologist?

A. Yes.

Q. From your review of the depositions in this case that you've described, that's basically what happended in the Michael Swayze surgery?

A. That's correct.

. . . .

Q. And the young man, Danny Collier, had had, if I remember correctly, ten or eleven years of experience at day-to-day practicing anesthesiology [ (sic) ], so I don't think we could find fault with his experience, could we?

A. I haven't reviewed his cases, but in generic terms, no.

Q. So, I think that's what lets you come to your conlusion that Danny Collier just had lack of understanding of the product that he was utilizing; is that correct?

A. Yes, the lack of understanding of the consequences.

. . . .

Q. I understand what the law says, but is it a fact, Doctor, that generally surgeons in Mississippi, and including these hospitals where CRNA's practice their trade without supervision of an anestheologist (sic), that these surgeons generally were unfamiliar with anesthesia agents, their propensities and their side effects, similar to Dr. Attix's unfamiliarity that you testified to—is that a fair statement?

A. That's a fair statement.

Q. So, my question is: Who was actually exercising the independant medical judgment in these communities where CRNA's were practicing their trade without the supervision of an anesthesiologist if the surgeons were generally unfamiliar with the agents, the propensities and the side effects?

A. No one.

. . . .

Q. So what I am saying is: It was pretty common knowledge in the anesthesia community that there were certain hospitals that CRNA's were practicing their trade [in] without supervision and the surgeons were basically unfamiliar with the anesthesia agents, the propensities and the side effects; and, therefore, nobody was really exercising independant medical judgment for the patient with regard to anesthesia?

APPENDIX I—Continued

A. That's correct.

Q. And that was pretty common knowledge in the anesthesia community?

A. It was for that reason that I had the surgery residents from the University of Mississippi rotate through anesthesia, because I don't agree with it, I think it's wrong. But it currently is no different in Mississippi than it is in any other state in the union in 1985. And this is one of the problems we have in which CRNA's at the present time, in 1985, as a matter of fact are—in some states have a license to practice anesthesia unsupervised.

Record, Vol. 3, at 146, 150, 152–54. Finally, Dr. Roy Wilson testified as follows:

Q. Doctor, were you familiar and are you now familiar with the commonly recognized medical standards in Mississippi in 1977 and '78 as to the qualifications that a person must possess in order to prescribe and administer a narcotic anesthesia drug such as fentanyl?

A. Yes, sir.

Q. What were those standards?

A. A person must be a licensed physician, dentist, or in the case of veterinarian, portions of the drugs of a veterinarian [ (sic) ] in order to administer these drugs or to dispense the drugs.

Q. Under these commonly recognized medical standards that we're referring here, did nurse anesthetists possess the professional qualifications to prescribe and administer fentanyl?

A. To administer, but not to prescribe.

Q. All right, sir. Under the standards that we're talking about, Doctor, what does the term, and I quote, under the direction and supervision, end quote, of a physician mean?

A. This means that the drug, or whatever method of anesthetizing an individual, if it were an inhalation agent, is being administered essentially on the license of a physician.

Q. All right, sir. How does the requirement that we've just talked about under prescription and administration and under the direction and supervision of a physician limit, if at all, a nurse anesthetist in his or her independent, number one, selection of the anesthesia agent, the dosage to be administered, and the administration itself of the drug?

A. This can probably only be answered by saying that there is a dichotomy of care, because there is practice and propriety: Practice being the way that it is commonly done; propriety being the way that it is legally constituted and ethically constituted to administer these drugs.

Q. Under medical propriety, Doctor, how would that limit the nurse anesthetist in that category? You mentioned the dichotomy of the situation?

A. This would limit the nurse, because the nurse has no license nor is able to obtain a license to administer narcotics.

Q. Were these standards of practice that we've just discussed, known and recognized in the medical community in Mississippi and among manufacturers and sellers of ethical [prescription] drugs in that state in 1977 and '78?

A. To the best of my knowledge, yes.

. . . .

Q. Can the instances which you've discussed where anesthesia was being performed by nurse anesthetists in Mississippi in this time period that we're talking about without the supervision of an anesthesiologist, who, if anyone, actually supplied the, quote, physician direction and supervision, end quote, requirement of the standard which you previously mentioned?

A. In the circumstances where there was supervision of any type, it was by the operating surgeon.

Q. In actuality, as a matter of routine practice, who made these decisions in those situations?

A. In most circumstances, the nurse anesthetist made this decision.

Q. Was that fact commonly known in the medical community in Mississippi in 1977, '78?

APPENDIX I—Continued

A. It was.

Q. Who generally, and as a matter of routine practice in these situations, selected the drugs and determined the dosage to be administered?

A. Under most circumstances, the nurse anesthetist.

Q. What part, as a matter of routine practice, if you know, Dr. Wilson, did the operating room surgeon or his assisting physician generally play in selecting the particular anesthesia drugs to be used in such a case and/or the dosage to be administered to the patient?

A. Unfortunately, very little.

Q. To what extent—what was the extent of the knowledge within the medical community within Mississippi and the drug community in Mississippi in 1978 that this practice which we've just discussed was prevalent and being done?

A. It was absolute.

. . . .

Q. [D]o you have an opinion that you can state, based on reasonble medical probability, as to whether or not a nurse anesthetist in general or Mr. Collier, the nurse anesthetist in Michael's case on July 13th, had the medical expertise to select the drug, to determine its dosage and to administer it without the intervention of an anesthesiologist based on what he read from Plaintiff's Exhibit 8 [the McNeil warning]?

A. Mr. Collier has no medical license or qualifications, and so, therefore, the answer on that basis alone would be, no, he did not have.

Rec. Vol. 4, at 268–72.

APPENDIX II

Dr. Wilson also testified:

I feel that the selection of the anesthetic fentanyl for a child with this type of surgery was totally inappropriate at the time it was selected; second, the amount of anesthesia given to the child was extremely large to the point of being dangerous in itself; third, the administration of additional doses of the fentanyl to the child were done with no documentation as to any necessity on the part of the nurse anesthetist.

Rec. Vol. 4, at 282.

